**Opinion filed November 30, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00303-CV
_____

## LARRY TURNER, Appellant

## V.

## NJN COTTON COMPANY, Appellee

**On Appeal from the 106th District Court**

**Dawson County, Texas**

**Trial Court Cause No. 11-02-18530**

## O P I N I O N

The disagreement that underlies this appeal arises from the purchase and sale of a cotton crop in Dawson County for the crop year 2010. After a jury trial, and in accordance with answers to questions presented to it by the trial court, the jury found that Larry Turner agreed to sell his entire 2010 cotton crop to NJN Cotton Company at a certain price and that it was to be delivered after the 2010 harvest. The jury also

found as follows: Turner failed to comply with the agreement; Turner admitted in his testimony that he contracted with NJN for the sale of his 2010 cotton crop; NJN did not send Turner a written confirmation of the contract within a reasonable time; Turner received confirmation of the contract and had reason to know the contents of it; and Turner did not give written notice of his objections to the contents of the confirmation within ten days after he received it.

The jury assessed damages of $407,607.74 against Turner. Additionally, because the jury found that NJN substantially relied to its detriment on Turner's promise and that such reliance was foreseeable by Turner, it assessed damages of $3,400 that resulted from that reliance. Further, the jury found that $60,000 was a reasonable and necessary amount for attorney's fees.

The trial court entered a judgment in favor of NJN in accordance with the verdict of the jury. In addition to postjudgment interest, the trial court awarded NJN $49,303.79 in prejudgment interest. Finally, the trial court ruled that Turner take nothing on the counterclaims that he had brought against NJN. We affirm.

Larry Turner is a cotton producer in Dawson County. Judy Seely owns and operates NJN Cotton Company. Seely purchased NJN in 1984. Before that, she had worked for the company for approximately fourteen years, beginning in 1970.

NJN buys cotton from cotton producers, such as Turner, and then sells the cotton to shippers. The testimony in this case reveals two ways in which a buyer and seller transact the business of buying and selling cotton: "forward contracts" and sales by bid after harvest. When a producer sells cotton by forward contracts, the producer and the buyer agree to the purchase and sale of a cotton crop to be harvested in the future. The producer informs the buyer of the number of acres that he expects to plant as well as the number of bales that he expects to produce per acre. After the producer and buyer enter into the forward contract at a certain price, the buyer then sells that cotton to a shipper for future delivery. Normally, a producer enters into a

2

forward contract because he likes the then prevailing price for cotton and wants to lock it in for his future cotton crop.

In his testimony, Turner described the custom for buying and selling cotton when a producer has not entered into a forward contract—the cotton is ginned and the gin will find buyers for it. The gin sends information regarding the cotton (a "recap") to various buyers and those buyers may bid on the cotton. It is then up to the producer to determine whether he wants to accept any of the bids. These sales are accomplished orally based upon the recap sheet.

The primary issue in this appeal is whether Turner was obligated to sell his 2010 cotton crop under a forward contract. NJN maintains that he was; Turner argues that he was not.

At the time of the transaction out of which this lawsuit arose, NJN had known Turner for a number of years and had purchased Turner's cotton on multiple occasions—almost every year since NJN began doing business. Although Turner and NJN had previously entered into only one contract for the sale of cotton before it was ginned (on that occasion it had been stripped and was in modules, but not yet ginned), NJN had negotiated a forward contract between Turner and a third party. In the one instance that Turner and NJN had entered into a forward contract, they signed a written contract. According to Seely, NJN and Turner executed no other contract on any of the other transactions between them.

In April 2010, before Turner had planted his cotton crop for that year, he contacted NJN about contracting his 2010 cotton crop. At that time, the contract price for cotton was 1300 points over the government loan price per bale of cotton. Turner did not want to accept that price. Seely testified that Turner told her that, if the price rose to 1400 points over, he would contract his cotton. Turner, on the other hand, testified at trial that he told Seely that, if the price rose to 1400, to call him.

However, in Turner's deposition, he had testified, "I told her if it got to 1400 over, I would contract the cotton."

Seely testified that she phoned Turner a few days later, when the market price for cotton had gone up, and told him that she could offer 1400 if he still wanted to sell his cotton. Seely testified that Turner said that he did. Turner testified that he told her that 1400 was an acceptable price. In his deposition, Turner testified that Seely told him in April that she would pay him 1400 for his cotton and that he accepted it. He also said that he understood that the effect of this conversation was that, at the end of the ginning season, Seely would pay him money and that he would deliver the cotton to her. Additionally, Sammy Stevens testified that Turner had told him that he had agreed to sell his 2010 cotton crop to Seely.

Seely testified that she did fill out a contract form in this instance but that she did so simply to remind herself of the deals that she had made. The contract form that Seely filled out was dated April 12, 2010, the date that she talked to Turner on the phone. Although Seely expected Turner to sign the written agreement, she did not send it to him to sign because he did not ask to sign it and never expressed any concern or need for a written contract.

In October 2010, Seely sent Sparenberg Gin a list of producers from whom she had purchased 2010 cotton. Sparenberg Gin was the gin that Turner had used to gin his cotton for approximately fifty years. At the time of the events that formed the basis for this lawsuit, Turner was president of Sparenberg Gin and held a twenty percent ownership interest in it.

Although Turner's testimony was that he expected to sign a contract, he did not ask Seely for the contract until someone at the gin notified him that his name was on the list that Seely had furnished to the gin. In November 2010, after Turner found out that Seely claimed to have his cotton under contract, he went to Seely's office to get a copy of the contract. He wanted the contract so that he could take it

4

to "somebody" to have them look at it. In Turner's deposition testimony, he said that he did not sign the contract in November because the price had gone up and he thought that he could get a better deal from someone else. And, he said, "I'm not going to lie about that."

"Maybe the afternoon [of] the next day after [Turner] was in [Seely's] office," Turner's then attorney faxed a letter to her. In that November 16, 2010 letter, Turner's lawyer told Seely that Turner would not be selling his cotton to NJN and that, if she had a copy of "an enforceable contract," to send it to him. Seely sent a copy of the form contract to Turner's lawyer.

Seely had already entered into an agreement with Allenberg, a cotton shipper, whereby she agreed to sell NJN's cotton, including that which she thought that she had bought from Turner, to Allenberg at a price of 1460 points over the government loan price. NJN's contract with Allenberg called for NJN to deliver 7,500 bales of cotton to Allenberg.

Although Seely, as late as November 2010, still expected that Turner would deliver his cotton as he always had, he did not. Turner told the manager at Sparenberg Gin not to sell his cotton. At the time of trial, Turner's cotton was still in the warehouse, unsold.

Ultimately, NJN could not deliver 1,935 bales out of the 7,500 bales that it had agreed to deliver to Allenberg. The shortage was not entirely the result of Turner's failure to deliver his cotton—he produced only 896 bales. In order to make good on its obligation to Allenberg, NJN agreed that in 2011 it would deliver to Allenberg 2.3 times the amount of the 2010 shortage. NJN met that obligation. Seely testified that NJN's cost to deliver 2.3 times the Turner cotton was approximately $737,493.

When Turner did not deliver his cotton, NJN sued him. Turner answered the lawsuit with a general denial and some fifteen affirmative defenses; he also alleged

5

counterclaims for conversion and tortious interference. After a jury trial, Turner filed this appeal from the adverse judgment that the trial court had entered against him in accordance with the verdict of the jury.

In his first issue on appeal, Turner argues: "The law of contracts, Statute of Frauds, and Merchant's Exception preclude the existence of an agreement between NJN and Turner." In his brief, Turner sets out the standards for a legal sufficiency review as well as for a factual sufficiency review. However, Turner directs the argument portion of his brief to "matter of law" issues. Therefore, we will not discuss matters relative to factual sufficiency.

Section 2.201(a) of the Texas Business and Commerce Code controls contracts for the sale of goods for the price of $500 or more:

> (a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

TEX. BUS. & COM. CODE ANN. § 2.201(a) (West 2009).

One of the exceptions contained in Section 2.201, subsection (c) provides:

> (2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted.

*Id.* § 2.201(c)(2).

In response to Question No. 1, at least ten members of the jury found that Turner and NJN agreed that "Larry Turner would deliver his entire cotton crop

6

produced in 2010 to NJN Cotton Company for a price of 1400 points over the loan price to be delivered after harvest." In answer to Question No. 5, the jury found that Turner admitted that he and NJN made a contract for the sale of his 2010 cotton to NJN. In the absence of a factual sufficiency complaint, if the answer of the jury to Question No. 5 is supported by legally sufficient evidence, then the effect of that answer is that the exception provided for in Section 2.201(c)(2) has been proved and the prohibition of the statute of frauds is avoided.

When we conduct a legal sufficiency review, we consider all the evidence in the light most favorable to the verdict. We credit any favorable evidence if a reasonable factfinder could, and we disregard any contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005). Whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact. *Otto Vehle & Reserve Law Officers Ass'n v. Brenner*, 590 S.W.2d 147, 152 (Tex. Civ. App.—San Antonio 1979, no writ). The jury, as the trier of fact, is entitled to judge the credibility of the witnesses, to accept or reject any part of the evidence, and to resolve any conflicts in the evidence. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

We are of the opinion that the evidence is legally sufficient to support the jury's affirmative answer to both Question No. 1 and Question No. 5. Seely testified that Turner agreed to deliver his 2010 cotton crop to her for 1400 over the government loan price. In his deposition, Turner said that he agreed to deliver his 2010 cotton crop to NJN for 1400 over the government loan price. Sammy Stevens testified that Turner had told him that he had sold his 2010 cotton crop to Seely. This testimony is legally sufficient to remove the agreement from the statute of frauds, and the statute of frauds does not prohibit the enforcement of the agreement. Because we hold that NJN has shown that the exception in Section 2.201(c)(2)

7

applies to the Section 2.201(a) statute of frauds requirement, we need not discuss Turner's argument related to the merchant's exception contained in Section 2.201(b). Insofar as Turner directs his first issue on appeal to the legal sufficiency of the evidence to support the jury's answers to Question No. 1 and Question No. 5, we overrule it.

Also in his first issue on appeal, Turner argues that "[t]here is no evidence to support a jury finding of a written contract between NJN and Turner." We note that, as NJN points out, the jury did not find that a written contract existed. What it found, in response to Question No. 1, was that Turner and NJN agreed that he would deliver his entire 2010 cotton crop to NJN at a price of 1400 points over the government loan price, to be delivered after harvest. And, in response to Question No. 5, the jury found that Turner admitted in his testimony that he and NJN entered into a contract for the sale of his 2010 cotton crop to NJN. The question was not whether there was a contract—a question that is normally reserved for the trial court's determination; the question was whether Turner *admitted* that he entered into a contract. *See Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex. App.—Dallas 2006, no pet.). NJN does not claim that there was a written contract in this transaction, and neither were there any jury findings that such a written contract existed. NJN seeks recovery under an oral contract. Insofar as Turner directs his first issue to the legal sufficiency of the evidence to support a finding relative to a written contract, we overrule it.

As an additional argument in his first issue on appeal, Turner takes the position that there is no valid and enforceable contract between NJN and him. In his brief, Turner argues that the "[e]lements of a valid, enforceable contract are offer, acceptance, a meeting of the minds, each party's consent to the terms, execution and delivery of the contract with the intent that it be mutual and binding, and consideration."

8

The elements of a valid contract are (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321, 325 (Tex. App.—Tyler 2006, no pet.). Although, in most cases, courts have held that the elements of proof are the same for oral contracts as for written contracts, we assume those holdings to exclude the fifth element that deals with execution and delivery. *See, e.g.*, *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 284 (Tex. App.—El Paso 1991), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 218 (Tex. 1992). In the case of an oral contract, these elements may be proved by either circumstantial or direct evidence. *Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex. App.—San Antonio 2000, pet. denied). When we make that determination, we look to the communications between the parties and the acts and circumstances that surround those communications. *Palestine Water Well Servs.*, 188 S.W.3d at 325. When we determine whether there was a meeting of the minds, and therefore an offer and acceptance, we objectively look at what the parties actually said and did rather than peering into the parties' subjective states of mind. *Id.* The fact that the parties contemplate that an informal agreement is to be reduced to a formal writing later does not necessarily prevent present, binding obligations from arising. *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 455 (Tex. App.—Dallas 2012, pet. denied).

We have held that the evidence was legally sufficient to support the jury's findings in response to Question No. 1 and Question No. 5. It was within the province of the trial court to determine whether those findings were such as would support a judgment that an enforceable contract existed between Turner and NJN for the sale of Turner's entire 2010 cotton crop for 1400 points over to be delivered at the end of the 2010 harvest. In this case, there was evidence that Turner had agreed

that, at the end of the 2010 harvest, he would sell his entire 2010 cotton crop to NJN for a price of 1400 points over the government loan price. Seely testified that there was nothing else cotton buyers and sellers needed to know in order to buy and sell cotton. This is some evidence that those were the essential terms. Therefore, there was evidence from which both the jury and the trial court could find that there had been an offer, an acceptance in strict compliance with the terms of the offer, a meeting of the minds, and consent of each party to the essential terms of the agreement and that those terms constituted a contract between Turner and NJN. We hold that, on the record before us, the trial court did not err when it entered its judgment enforcing the oral contract between Turner and NJN. We overrule Issue No. 1.

In his second issue on appeal, Turner maintains that the trial court erred in various respects in its charge to the jury. Additionally, at one point in this portion of his brief, Turner interposes an argument about the exclusion of certain evidence. In his brief, Turner begins his discussion of "Charge Error" by noting that "[d]espite a rather tumultuous and jumbled charge conference," he properly presented his jury charge matters to the trial court. NJN joins in with the statement that "[t]he charge conference lasted over three hours" and points out that the charge conference covers over 100 pages of the reporter's record. NJN maintains that Turner improperly submitted his requests for definitions and instructions "in a bulk, intermingled, and confusing form" in violation of Rule 278 of the Texas Rules of Civil Procedure and has therefore waived any complaints relative to the jury charge. Although we would be hard-pressed to disagree with either party's statement, we will address Turner's jury charge complaints as we understand him to have presented them in his brief.

In his brief, Turner states: "In an attempt to avoid redundancy, the [jury charge matters] are grouped . . . based upon 1) requested instructions and clarifications, 2)

omission of mitigation instructions and refusal to submit evidence associated therewith, and 3) omitted claim of tortious interference."

Rule 278 of the Texas Rules of Civil Procedure requires the submission of jury questions that are supported by the written pleadings and the evidence. TEX. R. CIV. P. 278; *see Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). The standard of review for an allegation of jury charge error is an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). If a trial court abuses its discretion when it submits an instruction to the jury, we do not reverse in the absence of harm. *See Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex. 1995). Harm occurs when the error in the charge probably caused the rendition of an improper judgment or prevented the appellant from properly presenting the case to the court of appeals. TEX. R. APP. P. 44.1(a); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003).

We will first address the complaint with regard to Turner's claim for tortious interference. Although Turner pleaded a cause of action for tortious interference, the trial court granted NJN's motion for directed verdict as to the claim. When the trial court submitted the charge to the jury, the tortious interference cause of action was not before the jury. Turner leveled his argument at the trial court's failure to include the theory in the charge, not at the trial court's ruling on NJN's motion for directed verdict. Nevertheless, the elements of a tortious interference claim are (1) the existence of a contract subject to interference, (2) willful and intentional interference that (3) proximately causes damage, and (4) actual damage or loss. *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). The elements of a tortious interference with a prospective business relationship claim are somewhat different and are (1) a reasonable probability that the claimant would have entered

11

into a business relationship; (2) the existence of an independently tortious or unlawful act by the allegedly interfering party; (3) the interfering party did so with a conscious desire to prevent the relationship from occurring, or he knew that his conduct was certain or substantially certain to occur; and (4) the claimant suffered actual harm or damage as a result of the conduct of the interfering party. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh'g).

At the time of trial, Turner had not attempted to sell his 2010 cotton crop to anyone else, nor did he have any prospective relationships involving the sale of his 2010 cotton crop. Turner testified that he did not know of anything that Seely did to interfere with anyone to whom he might sell his cotton. We may uphold a trial court's order in which it grants a directed verdict if, among other things, the record discloses a complete absence of a vital fact. *City of Keller*, 168 S.W.3d at 810. Because there was no evidence of either type of tortious interference, the trial court did not err when it granted a directed verdict on Turner's tortious interference claim. Because the trial court did not err when it granted the directed verdict, the tortious interference claim was not before the jury. Because the tortious interference claim was not before the jury, the trial court had no duty to charge the jury on that claim. *See Salazar v. Sanders*, 440 S.W.3d 863, 873 (Tex. App.—El Paso 2013, pet. denied), *cert. denied*, 135 S. Ct. 1433 (2015).

We next consider Turner's complaint that the trial court erred by its "omission of mitigation instructions and refusal to submit evidence associated therewith." Turner bases this portion of his jury charge error argument on NJN's failure to "cover." NJN argues that it was not required to "cover" because it sought damages for non-delivery under Section 2.713. Under Section 2.711, if a seller fails to deliver goods, a buyer may "cover" and collect damages under Section 2.712, or the buyer may recover damages for non-delivery under Section 2.713. Bus. & Com. § 2.711.

The measure of damages under Section 2.712(b) is the difference between the cost of cover and the contract price, together with any incidental or consequential damages, less expenses saved in consequence of the breach by the seller. *Id.* § 2.712(b). The measure of damages for non-delivery under Section 2.713(a) is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in Section 2.715, less any expenses saved as a result of the breach by the seller. *Id.* § 2.713(a). A "buyer is always free to choose between cover [under Section 2.712] and damages for non-delivery under [Section 2.713]." *Id.* § 2.712 cmt. 3; *see Jon-T Farms, Inc. v. Goodpasture, Inc.*, 554 S.W.2d 743, 749 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.), *disapproved of on other grounds by McKinley v. Drozd*, 685 S.W.2d 7, 10–11 (Tex. 1985).

Here, NJN chose to recover damages for non-delivery under Section 2.713, not Section 2.712. That was its choice to make. Turner was not entitled to an instruction on cost to cover, and the trial court did not err when it did not give it.

Even if we were to assume that, in spite of Turner's specific reference to "cover," he means some broader concept of mitigation, he would still not prevail. The mitigation-of-damages rule prevents a party from recovering damages that result from a breach of contract that the non-breaching party could avoid by reasonable efforts. These reasonable efforts are those that a plaintiff can avoid at a trifling expense or with reasonable exertions. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) (citing *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936)). The defendant bears the burden to prove failure to mitigate damages; he must prove lack of diligence as well as the amount by which the damages were increased as a result of the failure to mitigate. *Cocke v. White*, 697 S.W.2d 739, 744 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

Turner has failed to present any evidence to show either a lack of diligence by NJN or the amount by which damages were increased as a result of any failure to mitigate. First, the undisputed testimony in this case is that there was no additional cotton that NJN could purchase—it had all been ginned and sold. Further, Turner argues that NJN could have "covered" the Turner cotton at a cost of some $564,000. We agree with NJN that $564,000 is hardly a "trifling expense." Seely testified that she could not have managed that. In the absence of evidence to support an issue on mitigation, the trial court did not err when it failed to instruct the jury on the laws of mitigation.

Turner also argues that the trial court erred when it excluded certain evidence that he claims constituted mitigation evidence. On February 10, 2011, Turner's lawyer sent a letter to NJN's lawyer in which he sought an agreement that the parties sell Turner's 2010 cotton and place the funds into the registry of the court. NJN's lawyer rejected that proposal. Turner sought to introduce that letter of rejection into evidence. The trial court admitted NJN's letter into evidence after certain portions relating to settlement were redacted. NJN argues that selling the cotton and placing the proceeds into the registry of the court until the legal matters were concluded cannot be considered as a matter of mitigation. We agree with NJN. We fail to see how selling the cotton and placing the proceeds into the registry of the court, so that, as Turner states in his brief, the money would be available for "dissemination based upon the outcome of the trial" has any bearing upon mitigation. Perhaps that course of action might ensure the availability of funds, but we cannot say that it concerns mitigation. We review evidentiary rulings under an abuse of discretion standard. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). Under this record, we cannot say that the trial court abused its discretion when it excluded evidence pertaining to a proposed settlement. In the absence of that evidence, the trial court did not err when it declined to instruct the jury on the issue.

14

We are left to resolve that part of Issue No. 2 that Appellant denominates "[a]buses of discretion in submission of the jury charge, including a lack of imperative definitions and instructions." He breaks the issue down into requested instructions and clarifications—as opposed to the remainder of the issue regarding "omission of mitigation instructions and refusal to submit evidence associated therewith, and . . . omitted claim of tortious interference." We have already addressed the latter parts of Issue No. 2, and we now proceed to consider Turner's complaints as they relate to Question No. 1 that the trial court submitted to the jury.

Again, Question No. 1 as presented to the jury was: "Did Larry Turner and NJN Cotton Company agree that Larry Turner would deliver his entire cotton crop produced in 2010 to NJN Cotton Company for a price of 1400 points over the loan price to be delivered after harvest?" The jury was to answer "Yes" or "No," and it answered "Yes."

In this portion of his second issue, Turner complains of the trial court's failure to include, in Question No. 1, the term "contract" and its failure to define "agreement," "course of performance," and "course of dealing."

NJN argues that, even though Turner wanted the term "agreement" to be defined in the charge, the term "agreement" was not used in Question No. 1. Rather, the term that was used by the court was "agree." NJN maintains that the term "agree" is to be taken at its common meaning and that no definition was necessary relative to Question No. 1. We are in accord. The term "agree" is not used in any special sense, is a word of common usage, and need not be defined. The same would be true if the trial court had used the term "agreement." *See W. Tex. State Bank v. Tri-Serv. Drilling Co.*, 339 S.W.2d 249, 256 (Tex. Civ. App.—Eastland 1960, writ ref'd n.r.e.). These words have a common meaning to average laypersons. Jurors of average intelligence are presumed to have construed these words in their ordinary

15

and usual sense. *Taylor v. Lewis*, 553 S.W.2d 153, 159 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.).

Additionally, Turner wanted the term "contract" to be used in the question and also wanted that word defined. Even if the term "contract" had been used, it would not have been used in any special sense, and we find no error in the trial court's failure or refusal to submit definitions of that term. *See Ortiz v. O.J. Beck & Sons, Inc.*, 611 S.W.2d 860, 868 (Tex. Civ. App.—Corpus Christi 1980, no writ). Furthermore, whether a particular set of facts—to be found by the factfinder— constitutes a contract is a question of law for the court. *Vermont Info. Processing, Inc. v. Montana Beverage Corp.*, 227 S.W.3d 846, 852 (Tex. App.—El Paso 2007, no pet.).

We next consider Turner's argument that the trial court should have instructed the jury as to the terms "course of performance" or "course of dealing." Although Turner refers to "all" previous pre-harvest or forward contracts between them, there was only one such contract between the two of them. The rest of their transactions were post-harvest transactions, all of which were oral. NJN rightfully argues that one prior transaction is no evidence of a previous "course of performance" or "course of dealing" between them in reference to forward contracts. In the absence of that evidence, it was not incumbent on the trial court to define the terms "course of performance" or "course of dealing" in this portion of the charge.

Even if Turner had been correct in each of his assertions regarding definitions for "agree," "agreement," and "contract" in connection with Question No. 1, we may not reverse a judgment in connection with errors of law unless we conclude that the errors "probably caused the rendition of an improper judgment." TEX. R. CIV. P. 44.1(a)(1). Turner has not made that showing. Rather, in conclusory fashion, Turner opines that the lack of those definitions "was sure to have led to an improper

16

decision by the jury." Turner has not shown that those alleged errors "probably caused the rendition of an improper judgment." *See id.*

Neither has Turner made that showing in relation to the absence of instructions on "course of performance" or "course of dealing" in Question No. 1. Turner argues: "Further, had appropriate instructions been given with regard to Question 1, the jury would have answered 'no[ ]' . . . . Because the refusal to include these instructions precluded such considerations, their exclusion probably caused the rendition of an improper judgment." The conclusory statement does not meet Turner's burden on appeal. Further, the lack of an instruction did not prohibit a consideration of the facts concerned with the circumstances surrounding the course of performance or course of dealing between the parties.

We next consider Turner's arguments in connection with instructions that he wanted to accompany Questions Nos. 2 and 3. Question No. 2, as submitted by the trial court, read: "Did Larry Turner fail to comply with the agreement?" Question No. 3 read: "Did NJN Cotton Company fail to comply with the agreement?" The jury answered that Turner failed but that NJN did not. Turner requested that the trial court give various instructions regarding time for compliance, delay in compliance, and excuse of compliance. And Turner again asserted his "course of performance" request. Turner frames and premises his argument upon the existence of a written contract; the jury did not find that there was a written contract. The trial court did not err when it refused to give the instructions. Furthermore, Turner's claim that the trial court's failure to give the instructions "likely caused the rendition of an improper verdict" was also tied to the existence of a written contract and what the jury would or would not have found in relation to a written contract.

In his final argument under his second issue on appeal, Turner faults the trial court for instructing the jury on circumstantial evidence. He claims that this error affected the jury's answer to Question No. 5. In Question No. 5, the trial court asked

17

the jury: "Do you find from a preponderance of the evidence that Larry Turner admitted in his testimony that a contract for sale was made with NJN Cotton Company for the sale of all of his 2010 cotton crop?" The jury answered: "He Admitted." The question was not whether there was a contract—that would be a question of law for the court. The question was whether he had admitted that he and NJN made a contract. In the case of an oral contract, the proponent may prove the contract by either circumstantial or direct evidence. *Harris*, 27 S.W.3d at 77. In making that determination, we look to the communications between the parties and the acts and circumstances that surround those communications. *Palestine Water Well Servs.*, 188 S.W.3d at 325. Even if the trial court was in error when it gave the general circumstantial evidence instruction, Turner has not shown that the inclusion of the instruction "likely caused the rendition of an improper verdict." He argues that it was improper for the jury to consider circumstantial evidence to determine whether Turner admitted that a contract for sale was made with NJN. Turner then posits that "the inclusion of this definition, along with a complete dismissal of the law surrounding application of the Statute of Frauds, probably caused the rendition of an improper verdict." Turner has not shown harmless error by that conclusory statement.

We overrule Turner's second issue on appeal in its entirety.

In his third and final issue, Turner combines complaints about damages with complaints about attorney's fees. He states his specific issue as follows: "Errors in the jury charge resulted in legally and factually insufficient verdicts on damages and fees and the rendition of an improper judgment." We will first discuss his damages arguments.

The trial court submitted the damages issue in Question No. 9 of the jury charge: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate NJN Cotton Company for its damages, if any, that resulted

18

from such failure to comply?" The trial court then instructed the jury that "[d]amages are the difference between the market price at the time NJN Cotton Company learned of Larry Turner's failure to comply and the contract price, less any expenses saved in consequence of Larry Turner's breach." They were also instructed not to add interest on damages. The jury answered $407,607.74.

Turner first argues that Question No. 9 was improper because it wrongfully omitted mitigation and cover instructions. We have already decided mitigation and cover issues adversely to Turner. It was NJN's option to obtain cover or to seek damages for non-delivery, and it chose the latter.

Next, Turner takes the position that the correct date on which to base market price in this case was November 2010, when his lawyer wrote to NJN and informed NJN that Turner would not deliver his cotton. That, argues Turner, is the date that NJN learned of the breach. He claims that it was error to base damages on the February 2011 date, the date that Seely says she finally realized that Turner was not going to deliver and the date that NJN used in its damage model. He argues that an award of damages based upon the use of any date other than the November date would be so against the overwhelming weight of the evidence as to be manifestly unjust. NJN counters that there was ample evidence to support the use of the February 2011 date.

The evidence shows that Turner went to NJN on November 15, 2010, and asked for a copy of the contract. Seely gave him the document that she said she had partially filled out as a memo to help her remember her deals. The next day, November 16, 2010, Turner's then lawyer sent a letter to NJN and advised NJN that Turner would not be selling his cotton to NJN. The lawyer also asked for a copy of the contract; NJN sent him a copy.

The evidence shows that it was not until February 2011 that NJN obtained Turner's recap sheet that showed when Turner had delivered his cotton to

Sparenberg Gin. Billy Shofner, the gin manager of Sparenberg Gin, testified that Turner had instructed him not to furnish the recap sheet to NJN. Fifty-four other NJN customers had performed on their oral contracts with NJN, and most cotton had been harvested and delivered by this time.

Seely testified that, based upon her prior dealings with Turner over many years, she continued to believe that Turner would deliver his cotton even after she received the letter from Turner's lawyer; he had always performed on his oral contracts. However, by February 2011, with all the information then available to her, Seely had decided that Turner was not going to deliver his cotton to NJN. On February 10, 2011, NJN sent a demand letter to Turner's lawyer.

We hold that use of the February date was proper. Under Section 2.610 of the Texas Business and Commerce Code, in cases of anticipatory breach, an aggrieved buyer may await performance for a commercially reasonable time before he chooses his remedy under Section 2.711. Bus. & Com. § 2.610. Section 2.611 of the Texas Business and Commerce Code allows a party an opportunity to retract his repudiation unless the aggrieved party has canceled or materially changed his position or has otherwise indicated that he considers the repudiation to be final. Bus. & Com. § 2.611(a). It could be that the breaching party desires to and does retract his repudiation before the other party selects its remedy. If Section 2.713 is read to mean that "learned of the breach" means when the seller first communicates his anticipated breach to the buyer, then that would interfere with the time that the buyer can await performance under Section 2.610. When we read all these provisions together, we are led to agree with the reasoning and holding in *Cosden Oil* that "an aggrieved buyer 'learns of the breach' [under Section 2.713] a commercially reasonable time after he learns of the seller's anticipatory repudiation." *Cosden Oil & Chem. Co. v. Karle O. Helm Aktiengesellschaft*, 736 F.2d 1064, 1072 (5th Cir. 1984). There is no claim here that NJN waited longer than a commercially

20

reasonable time after it received notice of repudiation before it selected its remedy. Therefore, we hold that it was not error to base the damage award on the February 2011 date.

Finally, also in Issue No. 3, Turner addresses the award of attorney's fees and argues that the evidence is factually insufficient to support the award. Turner's argument basically follows this line of reasoning: (1) NJN did not segregate its attorney's fees that would be recoverable in a breach of contract case from those that would otherwise be unrecoverable, such as a cause of action based upon promissory estoppel; (2) NJN should not have recovered on its contract action; and (3) because the attorney's fees awarded by the jury included both recoverable and unrecoverable attorney's fees and were not segregated, the award of attorney's fees must be set aside. We have already upheld the judgment based upon NJN's breach of contract action. Although attorney's fees that relate solely to unrecoverable amounts must generally be segregated from recoverable amounts, when discrete legal services advance recoverable and unrecoverable claims that are so intertwined, it is not necessary to segregate the fees in order to recover the entire amount. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006). Here, in order to recover on its breach of contract claim, NJN had to defend against the myriad affirmative defenses pleaded by Turner as well as the counterclaims that he pleaded for conversion and tortious interference. Attorney's fees incurred in defense of those matters were necessary to a recovery by NJN on its contract claim and, thus, were recoverable. *See Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (attorney's fees incurred in defending against defenses and counterclaim necessary to a recovery on contract are recoverable and need not be segregated). In any event, as far as Turner's claim that attorney's fees are not recoverable as relates to NJN's promissory estoppel claim, the weight of authority in Texas is that attorney's fees are recoverable under Section 38.001(8) of the Texas Civil Practices & Remedies

Code in a promissory estoppel claim. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015); *see, e.g.*, *Preload Tech., Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080, 1094–95 (5th Circ. 1983); *Corpus Christi Day Cruise, LLC v. Christus Spohn Health Sys. Corp.*, 398 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2012, pet. denied); *Traco, Inc. v. Arrow Glass Co.*, 814 S.W.2d 186, 193–94 (Tex. App.—San Antonio 1991, writ denied); *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 720 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

Finally, in Turner's third issue, he alleges that the evidence was factually insufficient to support the award of attorney's fees. Even if we are wrong in our holding that attorney's fees are fully recoverable, a complaint of factual insufficiency to support a jury finding, or that a jury finding is against the overwhelming weight of the evidence, must be raised in a motion for new trial. TEX. R. CIV. P. 324(b). Turner filed a motion for new trial, but the only mention of attorney's fees in it is that "[t]he Court should grant a motion for new trial because there is no evidence to support the jury's answer to question number 12." He did not raise his factual sufficiency complaints in the motion, and he effectively waived them.

We overrule Turner's Issue No. 3 in its entirety.

We affirm the judgment of the trial court.

JIM R. WRIGHT
CHIEF JUSTICE

November 30, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.