# NO. 12-16-00092-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PERMIAN POWER TONG, INC.,* *APPELLANT* | § | *APPEAL FROM THE 441ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *DIAMONDBACK E&P, LLC,* *APPELLEE* | § | *MIDLAND COUNTY, TEXAS* |

### *OPINION*[1]

Permian Power Tong, Inc., appeals the trial court's judgment in favor of Diamondback E&P, LLC. Permian raises five issues on appeal. We affirm in part, reverse and remand in part, and suggest a remittitur of a portion of the damages awarded in the judgment.

### BACKGROUND

Permian and Diamondback, through its predecessor Windsor Permian LLC, executed a Master Services Agreement (MSA), wherein Permian agreed to install pipe casing on several Diamondback wells in the Permian Basin area of Midland County, Texas.

One of the wells governed by the MSA, the Barron SW 14-11 well, is the subject of this suit.[2] After Diamondback's crew initially drilled the well to 355 feet, it requested that Permian install the pipe casing on the well. Permian agreed and installed the surface casing. Diamondback's drilling crew then drilled to a total depth of 5,347 feet. On May 25, 2013, and continuing until the early morning hours of May 26, 2013, Permian's four man drilling crew

---

[1] Pursuant to a docket equalization order issued by the Supreme Court of Texas on March 22, 2016, this appeal has been transferred to this Court from the Eleventh Court of Appeals in Eastland, Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We have applied precedent from that court where applicable. *See* TEX. R. APP. P. 41.3.

[2] The Barron SW 14-11 was previously named the Barron SW 14-14 well.

installed the 8 and 5/8 inch intermediate pipe casing in rainy conditions.  Upon completion of the work, O-Tex Plumbing, LLC, tested the well by performing a pressure test, concluded that it did not leak, and cemented the casing in place.

Later that afternoon, Diamondback attempted to enter the 8 and 5/8 inch intermediate casing with a 7 and 7/8 inch drilling assembly, but was unable to pass through the pipe joints. Diamondback attempted different methods to pass through the casing, including the use of a smaller motor and drilling assembly, as well as various bits and apparatuses to mill the obstructions.  During this process, Diamondback hired Express Energy Services to run a "caliper log," which is a device with fifty-six finger-like calipers that measures changes in the internal diameter of the pipe casing.  The caliper log showed no obstructions from the bottom of the hole until a depth of approximately 2,700 feet.  From that depth to the surface, the caliper log revealed that the pipe had been pinched, resulting in deformed egg-shaped pipe at roughly forty-five feet intervals.  Diamondback made further attempts to salvage the well, but ultimately decided that the only safe, efficient, and economical option was to plug and abandon the well.  Therefore, on May 29, 2013, Diamondback plugged and abandoned the well.

The parties agree that the casing is deformed, but disagree as to who and what caused the defect.  Unsatisfied with Permian's work, Diamondback filed suit in November 2013, asserting claims for negligence and breach of the MSA against Permian.  In October 2015, the case proceeded to a jury trial.  Diamondback ultimately nonsuited its negligence claim and the court submitted the case to the jury only on Diamondback's breach of contract claim.  The jury found in Diamondback's favor, finding that Permian failed to comply with the MSA.  The jury awarded $236,961.00 in remedial damages to compensate Diamondback for its reasonable and necessary costs to identify, repair, plug, and abandon the Barron SW 14-11 well.  It also awarded $587,176.97 in replacement damages, which represents Diamondback's reasonable and necessary costs to drill the Barron SW 14-14 replacement well to the point where it could successfully run the drilling assembly through the well after installing the intermediate casing.[3]

The parties agreed to submit the attorneys' fees issue to the trial court.  Diamondback, as the prevailing party, filed Bill B. Caraway's affidavit and invoices in support of its fee request of

---

[3] The MSA contained a provision that disclaimed liability for both parties for special, indirect, incidental or consequential damages, which is presumably why Diamondback did not seek damages for lost production on the Barron SW 14-11 well.

2

$319,761.50 and for conditional appellate attorneys' fees. Permian objected to the affidavit, arguing that the redacted and block-billed attorney invoices attached to the affidavit were insufficient. Diamondback filed Caraway's supplemental affidavit, along with unredacted copies of the billing statements reflecting the work performed in connection with the case. Permian filed further objections, urging the trial court to refrain from considering Caraway's late billing invoices, and furthermore that it should not award fees for unrelated work, block-billed entries, or duplicative work.

In its judgment, the trial court awarded Diamondback (1) $824,137.97 in actual damages based on the jury's findings, (2) $319,761.50 in attorneys' fees incurred at trial, (3) $150,000.00 in conditional appellate attorneys' fees for representation in the intermediate court of appeals, (4) $75,000.00 in total conditional appellate attorneys' fees for representation in the Texas Supreme Court, and (5) $3,512.90 in court costs.[4] At the request of the parties, the trial court issued its findings of fact and conclusions of law in support of its attorneys' fees award.[5] Permian filed various postjudgment motions, which the trial court denied. This appeal followed.

## COMPLIANCE WITH THE MASTER SERVICES AGREEMENT

In Permian's first and second issues, it challenges the legal and factual sufficiency of the evidence to support the jury's findings that it breached the MSA and caused Diamondback's damages. As part of its second issue, Permian argues that Diamondback caused or exacerbated its own damages, and failed to mitigate its damages. Since these issues relate to the sufficiency of the evidence, we address them together.

### Standard of Review

In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the trial court's judgment and indulge every reasonable inference in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. We may only sustain a legal sufficiency challenge when (1) the

---

[4] The trial court awarded $50,000.00 in conditional appellate attorney's fees to Diamondback for successful representation during the petition for review stage, and $25,000.00 for successful representation through oral argument and completion of the proceedings in the Texas Supreme Court.

[5] In its findings of fact and conclusions of law, the trial court overruled Permian's objections to Diamondback's evidence supporting its claim for attorney's fees.

3

record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the sole evidence offered to prove a vital fact, (3) the sole evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810.

More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. *Wal–Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.* Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Moreover, under the equal inference rule, a jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another. *Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013).

In reviewing a factual sufficiency challenge, we consider all of the evidence and uphold the finding unless it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). But factfinders are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Wilson*, 168 S.W.3d at 819. They may choose to believe one witness and disbelieve another. *Id.* If the evidence at trial would enable reasonable minds to differ in their conclusions, we will not substitute our judgment, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822.

**Applicable Law**

The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *See Caprock Inv. Corp. v. Montgomery*, 321 S.W.3d 91, 99 (Tex. App.—Eastland 2010, pet. denied). A breach of contract occurs when a party to the contract fails or refuses to do something that it has promised to do. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The last element encompasses a causation requirement. *Velvet Snout, LLC v. Sharp*,

4

441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.). A loss results from a breach of contract if the loss is the natural, probable, and foreseeable consequence of the breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery. *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.—El Paso 1998, pet. denied).

The mitigation of damages rule prevents a party from recovering damages that result from a breach of contract that the non-breaching party could avoid by reasonable efforts. *Turner v. NJN Cotton Co.*, 485 S.W.3d 513, 523 (Tex. App.—Eastland 2015, pet. denied). These reasonable efforts are those that a plaintiff can avoid at a trifling expense or with reasonable exertions. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). The defendant bears the burden to prove that the plaintiff failed to mitigate its damages, and it must prove lack of diligence as well as the amount by which the damages were increased as a result of the failure to mitigate. *Turner*, 485 S.W.3d at 523.

## Breach of the MSA and Causation

The court's charge asked the jury to decide whether Permian failed to comply with the MSA on any one of three grounds. The charge, submitted in broad form, required only a single answer for all three theories. The first ground asked the jury whether Permian failed to comply with its obligation in the MSA "that all [w]ork shall be done with the utmost skill, care and diligence, in a good and workmanlike manner, in accordance with the terms hereof and good industry standards of performance and in a timely manner . . . ." The jury charge defined "good and workmanlike manner" as "that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." The charge defined "utmost skill, care and diligence" as "such a degree of care as would be exercised by a very careful, prudent, and competent person under the same or similar circumstances."

The second ground asked whether Permian failed to comply with its obligation in the MSA "that all [g]oods and [Permian's] tools, machinery and equipment shall be the best quality for their purposes, maintained to be free from defect, meet all engineering standards and specifications provided by [Diamondback] and have been prepared, tested and shipped in accordance with the provisions hereof and in all applicable orders." The final ground for liability

5

asked whether Permian failed to comply with its obligation that "its subcontractors and their employees are sufficiently experienced and suitably trained to perform the work." The jury answered "yes" to the single broad form question.

Permian argues that, with the exception of the "company man," none of Diamondback's employees were present during the intermediate casing installation process, and therefore they had no personal knowledge or direct evidence as to whether Permian failed to comply with the MSA, and their testimony to the contrary is mere speculation. Additionally, Permian contends that Jesus Villasana, the company man, was only briefly present at the beginning and end of the installation process and saw nothing out of the ordinary.[6] Permian also argues that the remaining evidence is purely circumstantial, and that Diamondback's case relied largely upon the testimony of its expert Ronald Britton, whose opinions are based upon assumptions and speculation. Consequently, Permian's argument continues, the jury could not have reasonably inferred from such meager circumstantial evidence that it breached the MSA or caused the pipe damage, and that the evidence could give rise to any number of inferences as to what damaged the pipe casing, none more probable than another. *See, e.g., Marathon Corp. v. Pitzner*, 106 S. W.3d 724, 729 (Tex. 2003) (holding expert opinion was insufficient evidence when based on assumptions, inference stacking, and slight circumstantial evidence that worker's injuries from fall resulted from electrical shock after contacting high voltage wire in air conditioning unit, causing him to step back and stumble over gas pipeline, which then led to fall from roof).

Mike Hollis, Diamondback's Vice President and Chief Operating Officer, described the drilling and intermediate pipe casing process at trial. He explained that the pipe manufacturing company certified that the pipe was free of any defects. He also testified that the manufacturer used x-ray defraction testing, and verified that the pipe was the correct type and met the proper specifications prior to shipment. The trial court admitted Chung Hung Steel Corporation's "Mill Test Report," which is a document from the manufacturer certifying that the pipe used at the Barron SW 14-11 Well met proper specifications and was defect-free.

Once delivered to the drilling site, the casing was laid on racks next to the rig. J&W Casing Inspection, a third party contractor, inspected the threads on the pipe and cleaned them

---

[6] The "Company Man" is an experienced third-party contractor hired by the drilling company, in this case Diamondback, to oversee all aspects of the drilling process of a particular well, including the installation of intermediate pipe casing.

with a light surfactant.  J&W used a feeler gauge to make certain that every pipe joint was the appropriate long thread coupling (LTC) pipe.[7]  Then, J&W visually inspected the pipe for any defects.  Next, J&W conducted a "drift test," which involves physically passing an apparatus through the casing that is the same size as the drill bit assembly, ensuring that the drilling assembly may pass through the pipe interior during drilling operations.  Hollis explained that J&W conducted the drift test on every section of pipe casing.  J&W's drift report was admitted into evidence certifying that the internal diameter of the pipe would accommodate the drilling assembly and that it was not deformed immediately prior to Permian's installation of the pipe casing. Hollis further explained that if any section of the pipe casing failed the drift test, it would have been removed from the rack, set aside, and replaced by the manufacturer.

Villasana confirmed this process and testified that he personally observed a portion of the drift test.  He stated that his trailer is located next to the rig where the pipe is stored and that he could watch the inspection through his window.  He explained that if the drift test fails on a particular pipe joint, the inspector would inform him and they would have removed that pipe from the rack and replaced it with another one.

Villasana and the pipe installation crew conducted a meeting prior to installation of the intermediate casing, where they discussed safety protocol and reviewed the parameters of the job, including the type of pipe used and power tong torque settings.  Permian's installation crew consisted of four people: a crew hauler (Aaron Caine), a "stabber" (Aaron Mills), a lead floor hand (Bill Key), and a floor hand (David Holman).[8]  The floor hand holds the lower section of pipe protruding from the wellbore in place, while the stabber, who stands on a platform approximately forty-five feet in the air, holds the top section of pipe in place.  The lead floor hand attaches the slip and the tongs.  There are manual hand-operated slips, as well as a large slip known as a "spider."  They are used to grab the lower piece of pipe and impart lateral force,

---

[7] For the purposes of the issues in this case, there are three general types of pipe casing, short-thread coupling, long-thread coupling, and buttress.  The different types of pipe casing are used for different purposes.  For example, buttress pipe has a much stronger connection and is often used for more intensive drilling operations such as in wells that require horizontal drilling.  The different types of pipe have different torque settings to be applied during the installation process, which is one reason why it is important to make certain that the manufacturer, driller, and casing installation crew all know which type of casing is being installed.  An incorrect torque setting could damage the pipe.  According to Hollis, the pipe here was stenciled in white letters with "8 and 5/8 J-55 LTC," indicating that it was the appropriate casing for the Barron SW 14-11 well.

[8] A Diamondback crew member is also present. He operates the elevator that grasps the pipe off the rack, elevates it over the rig while Permian's crew makes the connection, and then he lowers the pipe into the well.

holding the pipe in place so that the connection between the pipe joints can be made. The slip also prevents the pipe from falling into the wellbore hole. The slips have dies, which are sharp teethlike pieces of metal that grasp the casing. The power tongs are large tongs that apply a preset amount of torque to physically turn the pipe. The crew hauler, the supervisor of the crew who operates the power tongs, screws the upper piece of pipe onto the threads of the lower piece of pipe with the power tongs. Once the connection is complete, the two connected pieces of pipe casing are lowered into the hole. This process continues until the crew reaches the required depth, in this case approximately 5,300 feet. After the pressure test confirmed the integrity of the connections throughout the well, the pipe casing was cemented into place.

Although the parties did not extricate the pipe to physically inspect it, the caliper log showed the nature of the deformities. The log revealed that the pipe was pinched at similar points at each joint from approximately 2,700 feet to the surface. Hollis and Britton initially thought that the pipe was overtorqued. However, Britton testified that each piece of casing was damaged where the slip grabbed the pipe. Robert Grace, Permian's expert, initially believed that the slip likely caused the deformity, although he ultimately offered a different theory. Curtis Lemons, Permian's owner, testified that any deformities of the magnitude discovered on the caliper log would have been visually detectable to the naked eye. Diamondback's attorney asked Grace whether the 3-D images of the pipe deformity would have been detectable by the naked eye. Although he vacillated in answering the question, Grace testified that he was "puzzled as to why somebody didn't see [the deformity]." Caine, Permian's crew hauler, testified that nothing appeared to be wrong with the pipe casing during the installation process.

Britton testified that only an external force could have caused the damage to the pipe casing. He also testified the damage occurred at consistent intervals on each piece of casing in the area where the slip grabbed the pipe, and that once the slip grabbed the pipe, the casing crew could no longer see that portion of the pipe. Britton acknowledged that there was a few feet of variance where the damage occurred on each portion of casing, but he explained that since this is a manual process, the lead floor hand does not always attach the slip at precisely the same place on each piece of casing.

Permian also points out that not every deformity is the same length, and that some of them are up to seven feet long. But Britton stated that the slip or spider was the only object that touched those areas of the pipe, and that there must have been a problem with the slip or spider,

8

such as a slip that was too small for the pipe casing, missing or defective dies, or that the slip or spider was broken or misaligned. He explained that those defects could have resulted in the different lengths of deformities. Caine testified that a slip that was too small would not close, and that the slips were color coated to match the correct pipe. Britton acknowledged that he did not know exactly what was wrong with the slip, but he faulted Permian in this regard because it failed to keep logs identifying and tracking the maintenance history on the tongs, slips, and other equipment used, which made it impossible to examine the equipment. Britton testified that this was a deviation of the industry standard. Britton was adamant, through the scientific process of elimination, that an external force must have caused the damage, the caliper logs showed damage that occurred at relatively consistent locations on each piece of pipe, the slip was the only thing that touched that area of the pipe, and that nothing could render this type of mark with this consistency in that area of the pipe except the slip or spider.

Permian also argues that Diamondback's elevator operator could have caused the damage. However, Britton testified that the elevator did not grab the pipe anywhere near where the damage occurred, and that it could not have caused the damage. Rather, he stated that the damage occurred where Permian's slip grabbed the pipe, and that the damage consistently occurred on each pipe joint from 2,700 feet to the surface.

Grace acknowledged that it appeared at first glance that the slips caused the damage. However, he proffered another theory, that the "bucking machines" that attach the pipe collars during the manufacturing process caused the damage prior to its arrival at the drilling site. As we have stated, the parties generally agree that deformations of this nature would have been visually detectable. Moreover, J&W did not discover any of these deformities during its inspection of each piece of pipe. Finally, the jury, as the factfinder, could have reasonably credited Britton's testimony and discredited Grace's testimony. *See Wilson*, 168 S.W.3d at 816.

When viewing the evidence in the light most favorable to the verdict, the jury could have reasonably concluded, without violating the equal inference rule, that (1) the pipe was free of any defect from the manufacturer; (2) J&W inspected the pipe casing onsite, conducted a proper drift test, cleaned the threads, and determined that it was the correct pipe and defect-free; and (3) that the pipe was free of any defects prior to Permian's installation of the casing. Moreover, the jury could have reasonably relied on the evidence from the caliper log showing damage to the pipe at approximately the same location of each piece of casing up to approximately 2,700 feet. The

9

jury could have reasonably believed Britton's testimony and concluded that the damage was caused by Permian's slips, and that the slips were defective, the incorrect size, or were improperly operated by Permian's crew. The jury could have also reasonably concluded that Permian's failure to comply with the MSA resulted in the deformity in the pipe casing and Diamondback's inability to use it, and that the deformities in the pipe were a probable, logical, and foreseeable result of the breach. *See Mead*, 615 S.W.2d at 687. Furthermore, in reviewing all the evidence in a neutral light, we cannot conclude that the jury's findings are so against the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *See Cain*, 709 S.W.2d at 176.

We therefore hold that the evidence is legally and factually sufficient to support the jury's finding that Permian failed to perform the work in a good and workmanlike manner as required by the MSA. Similarly, we hold that the evidence is legally and factually sufficient to support the finding that Permian failed to ensure that all tools, machinery, and equipment were maintained to be defect-free, that they met all engineering standards and specifications provided by Diamondback, and were prepared, tested, and shipped in accordance with the MSA. Consequently, we need not address Permian's remaining contention that the evidence is legally and factually insufficient to support a finding that it failed to adequately ensure that its employees are sufficiently experienced and suitably trained to perform the work.[9] *See* Tex. R. App. P. 47.1.

### Mitigation of Damages

Permian argues that Diamondback caused its own damages by milling the pipe casing, and that even if Permian caused some of the damage to the casing, Diamondback failed to reasonably mitigate its damages prior to plugging and abandoning the well. Specifically, it contends that the well could have been salvaged by attempting less aggressive methods prior to reaming the pipe casing interior metal with the milling assembly.

---

[9] Villasana overheard that at least one of Permian's crew was a "worm," which is an inexperienced crew member. However, the vast majority of the evidence showed that Permian's crew had extensive experience in installing pipe casing, and that most, if not all of them, had experience in all aspects of the installation process, including as a crew hauler operating power tongs. However, since we have held the evidence was legally and factually sufficient to support liability as to the other two theories, it is unnecessary to address this theory for the purpose of this appeal, even if we were to hold that the evidence was insufficient to support Diamondback's theory that the crew was inexperienced. This is especially true because all the theories were submitted in a single broad form question.

10

After the pipe was cemented in place, Diamondback attempted to enter the 8 and 5/8 inch intermediate casing with a 7 and 7/8 inch drilling assembly, but was unable to pass through the first pipe joint. Diamondback used a "tricone bit" to shear through the initial obstruction, but encountered another obstruction at the second pipe joint. Diamondback tried to send a smaller 6 1/8 inch drilling assembly through the pipe but encountered further obstructions. Diamondback then used a smaller motor, which was also met with obstructions at approximately forty-five feet intervals. Diamondback next decided to send a "watermelon mill" through the casing to mill out the obstructions.[10]   However, it continued to encounter obstructions in the pipe casing. Consequently, it ran the caliper log. Grace commended Diamondback's decision to run the caliper log. Diamondback ultimately reached 900 feet with the watermelon mill, but the mill became stuck as they attempted to remove it. Moreover, the caliper log showed that a portion of the pipe had exceeded its maximum diameter, indicating that the pipe may no longer be intact.

Diamondback decided that the only safe, efficient, and economical option was to plug and abandon the well. Diamondback considered other options such as extricating the pipe and replacing it with new pipe. However, the well was located in a residential neighborhood, and Diamondback was concerned that such efforts could contaminate the groundwater. Moreover, Diamondback was also concerned that the geology of the area made it difficult to extract the pipe, especially in its already brittle condition. Hollis and Britton explained that portions of the casing were located in a "redbed" geological formation, which requires tremendous force to extricate pipe. Diamondback believed that had it moved forward with that procedure, further damage to the pipe may have made it impossible to safely plug and abandoned the well.

Permian argues that Diamondback should have used a smaller drilling assembly. The record supports the conclusion that Diamondback used a smaller drilling assembly, but was unsuccessful. Permian also argues that Diamondback should have used swages or rolled the casing. Hollis testified that those procedures are employed when there are only a few sections of pipe to repair, not several thousand feet. Britton testified that he had seen approximately two dozen attempts to use rollers on deformed casing, and none have been successful.

Permian also argued that Diamondback should have allowed it the opportunity to extricate the deformed sections of pipe and replace them with new pipe casing. An e-mail from

_____

[10] Grace agreed that milling the deformed pipe is a valid procedure to resolve the problem, but that it should be a last resort.

Hollis to Diamondback employees and Dustin Bownds, Permian's Operations Manager, shows that they considered that as an option but decided against it. Britton testified that it would be unreasonable to allow the same company that caused the deformation in the pipe the opportunity to repair it. As we have stated, this procedure could have caused some of the pipe to disintegrate, which could cause environmental issues such as contamination of the groundwater. Britton stated that with enough money, it was possible to pull and replace the pipe. He testified that the casing patch procedure would only have approximately a ten percent chance of success if Diamondback spent approximately $500,000.00, and up to a forty or fifty percent chance of success if it spent approximately $1,500,000.00.

Lemons testified that Permian has experience pulling and replacing casing, and that he has done so on his own jobs and for other companies. Lemons stated that he could have replaced the deformed pipe with success, although the milling process implemented by Diamondback made that more difficult, because the pipe could break into pieces. He said he can pull the pipe in redbed and salt formations, but acknowledged that environmental issues are a legitimate concern. Grace estimated that the effort to pull and replace the pipe would cost approximately $140,000.00 for the work, plus approximately $197,000.00 for the cost of the new pipe casing, with a total range of $300,000.00 to $350,000.00 to complete the work. Grace believed that the milling operation was approximately $200,000.00 to $300,000.00, which was the same or less than the pull and replace option.

Finally, Permian argues that Diamondback's actions in milling the pipe caused damage because it removed metal from the pipe. However, the pipe was not suitable for its intended use prior to the milling procedure, and the evidence reasonably supports the conclusion that the casing was unsuitable due to Permian's actions and that Diamondback took reasonable steps to mitigate its damages, including some of the very efforts that Permian claims it should have conducted. Moreover, Grace admitted that milling the pipe was a suitable strategy, although a last resort.

Accordingly, the evidence reasonably supports the conclusion that Diamondback expended reasonable efforts in mitigating its damages. *See Turner*, 485 S.W.3d at 523.

We overrule Permian's first and second issues.

12

In its third issue, Permian argues that the trial court abused its discretion by admitting Diamondback's Exhibit 60A, which comprises the invoices Diamondback paid vendors, as support for its damages, to remediate the Barron SW 14-11 well and replace it with the Barron SW 14-14 well.

## Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Interstate Northborough P'ship*, 66 S.W.3d at 220. A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

Error in admitting evidence is generally harmless if the objecting party later permits the same or similar evidence to be introduced without objection or the contested evidence is merely cumulative of properly admitted evidence and is not controlling on a material issue dispositive of the case. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Interstate Northborough P'ship*, 66 S.W.3d at 220; *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984).

## Discussion

Permian contends that Diamondback failed to lay the proper foundation for Plaintiff's Exhibit 60A as a business record, and that the trial court therefore abused its discretion in admitting it into evidence. Diamondback argues that it laid the proper foundation, and that in any event, Exhibit 60A is cumulative of other evidence, rendering any error in its admission harmless.

At trial, Hollis testified that Diamondback's invoices totaled approximately $824,000, and Diamondback offered into evidence the invoices it paid each vendor as Exhibit 60. The trial court sustained Permian's objections to the invoices in Exhibit 60 and to Hollis's testimony concerning losses of $824,000.00. Diamondback subsequently offered a summary of the invoices in Exhibit 61, as well as a new version of the invoices in Exhibit 60A. Permian's counsel stated that he had no objections to Exhibit 61, and that he had the same objections to Exhibit 60A that he lodged for Exhibit 60. The trial court admitted both exhibits.

Among other information, the summary in Exhibit 61 identified each invoice, the well on which the work was performed, the vendor, invoice date, and invoice amount. The summary also had an entry totaling all the invoices in the amount of $824,137.99.[11] Hollis testified that all of the invoices in Exhibit 60A were paid because they had a check number written on them corresponding to a check issued by Diamondback. He also testified that if an invoice was in the binder comprising Exhibit 60A, then it resulted from the project at issue and Diamondback paid the invoice. Without objection, Hollis testified that the total amount in Exhibit 61 was $824,137.99. Similarly, Hollis testified earlier that Diamondback's field estimate reports showed approximately $871,000.00 in estimated damages. Moreover, Britton testified without objection that he estimated reasonable damages in the amount of $850,000.00.

Even if the trial court erred in admitting Exhibit 60A, a question we do not reach, Appellant failed to object to the same or similar evidence concerning the amount of remedial and replacement damages. Therefore, any error in Exhibit 60A's admission is harmless. *See McShane*, 239 S.W.3d at 234; *Interstate Northborough P'ship*, 66 S.W.3d at 220; *Richardson*, 677 S.W.2d at 501.

We overrule Permian's third issue.

## DAMAGES

In its fourth issue, Permian argues that the damages awarded by the jury are not supported by legally and factually sufficient evidence, and are excessive.

---

[11] The jury awarded Diamondback $824,137.97, which is two cents less than the amount in the summary. This is because in its closing jury argument, Diamondback asked for $236,961.00 in remedial damages, and $587,176.97 in replacement damages, for a total of $824,137.97.

14

**Standard of Review and Applicable Law**

Generally, the measure of damages for breach of a contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. ***Penner Cattle, Inc. v. Cox***, 287 S.W.3d 370, 372 (Tex. App.—Eastland 2009, pet. denied).

We review an excessive damages complaint for factual sufficiency of the evidence. ***Mar. Overseas Corp. v. Ellis***, 971 S.W.2d 402, 406 (Tex. 1998). In a factual sufficiency review, we are to consider and weigh all of the evidence both supporting and contradicting the finding in question. ***Plas–Tex, Inc. v. U.S. Steel Corp.***, 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the finding only if the evidence supporting it is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. ***Dow Chem. Co. v. Francis***, 46 S.W.3d 237, 242 (Tex. 2001); ***Cain***, 709 S.W.2d at 176. When reversing a trial court's judgment for factual insufficiency, the court of appeals must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust. ***Ellis***, 971 S.W.2d at 406–07.

If part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial. *See **Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.***, 299 S.W.3d 106, 124 (Tex. 2009) ("[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment[]"); ***Samuels v. Nasir***, 445 S.W.3d 886, 894 (Tex. App.—El Paso 2014, no pet.) (Texas Rule of Appellate Procedure 46.3 permits court to suggest remittitur when "appellant complains there is insufficient evidence to support an award and the court of appeals agrees, but concludes there is sufficient evidence to support a lesser award").

**Discussion**

Permian argues that it did not cause any physical damage to the pipe or Diamondback's damages, and even if it did cause some damage to the pipe, Diamondback's damages were exacerbated by its failure to try less invasive procedures prior to milling it. However, we have already addressed Permian's complaint in this opinion and held otherwise. Permian also argues that even if Diamondback needed to plug and abandon the Barron SW 14-11 well and replace it

with the Barron SW 14-14 well, Diamondback's expenses related to completing the replacement well to the same point as plugging and abandoning the former well ended on September 27, 2013, or alternatively on September 29, 2013, at the latest. Consequently, Permian's argument continues, the evidence is legally and factually insufficient to support the full amount of damages awarded by the jury, and it requests that we suggest a remittitur.

Specifically, Permian argues that the damages ceased when Diamondback cemented the intermediate casing on the Barron SW 14-14 well, which occurred at 5:45 a.m. on September 27, 2013. Consequently, Permian contends that the total damage award should be reduced by $87,098.54. Alternatively, Permian argues that Diamondback's replacement damages expired sometime on September 29, 2013, which is the date that Diamondback moved from the intermediate casing phase to the production phase on the replacement well. Under this alternative, Permian contends that the total damage award should be reduced by $62,954.92. It argues that all invoices for work after these dates are irrelevant, because an award for those amounts is unsupported by the court's jury charge.

The trial court defined replacement damages as "the reasonable and necessary cost to drill [the replacement Barron SW 14-14 well] to the point at which the [Barron SW 14-11 well] was plugged and abandoned due to [Permian's] failure to comply, if any. . . ." Prior to plugging and abandoning the Barron SW 14-11 well, Diamondback had cemented the casing in place, unsuccessfully attempted to run its drilling assembly through the casing, and conducted all remediation efforts. Consequently, the appropriate replacement damages, and the amount Diamondback seeks as its replacement damages, are its costs in replacing the faulty well to the point it successfully ran the proper drilling assembly through the replacement well.

Under the damage model in the charge, September 27, 2013 was not a proper cutoff date for damages, because Diamondback had not been able to pass its drilling assembly through the intermediate casing on the replacement well on that date. As to September 29, 2013, Permian points to daily drilling report entries showing that Diamondback went from the "intermediate phase" to the "production phase," and there is an entry that Diamondback made a "trip in hole" with the "bottom hole assembly" containing the drill bit starting at 9:30 p.m. It argues that this is an appropriate cutoff time for damages, and that all invoices past that point are unrecoverable. We disagree. During trial, Hollis and Permian's counsel had the following exchange:

16

Q. All right. So would the cutoff point be, then, when the phase type that's listed [in the September 29, 2013 daily drilling report] changes from [intermediate] to production?

A. It would be very shortly after that, you'll see "pick up [bottom hole assembly]." And it's going to be running in the hole. And actually when we get through it, we pick up the shock sub. You have to pick the [bottom hole assembly] up, and it -- so it would be roughly the next day when we're going in the hole.

The daily drilling reports on September 29, 2013 and September 30, 2013 expound on Hollis's testimony. Entries in these reports note that Diamondback needed to use "jars." Hollis explained elsewhere in his testimony that jars are shock absorbers on a string that allow the driller to "hammer" itself out of a portion of the pipe so that the assembly can pass through an obstruction in the casing. The September 30, 2013 daily drilling report shows that the crew "picked up the jars" and made a "trip in the hole" that was completed at 10:00 a.m. From 10:00 a.m. until 12:15 p.m., it appears that Diamondback encountered an obstacle while passing the assembly through the intermediate casing, but resolved the problem. At 12:15 p.m., Diamondback prepared the rig for further drilling, which continued past the intermediate casing at 2:00 p.m. The remainder of the entries in the September 30th daily drilling report indicate that Diamondback had begun drilling to production depth and continued that process for several days. Therefore, Diamondback's damages ceased when it began drilling in the production phase at 2:00 p.m. on September 30th.

Permian did not explain how it arrived at its $62,954.92 overpayment in damages, nor were we able to ascertain the basis for that calculation in our review of the record, whether that be from the invoices in Exhibit 60A, the amounts in the summary in Exhibit 61, or the amounts identified in the daily drilling reports for field cost estimates. However, our review of the record demonstrates that the jury overcompensated Diamondback. Based on Diamondback's damage summary in Exhibit 61, the jury awarded $20,382.96 for J.B. Hunt Gas & Oil Drilling's crew operations on September 30th. That includes all work completed that day, including production phase drilling from 2:00 p.m. until 6:00 a.m. the following morning.[12] Those damages are unrecoverable. J.B. Hunt's invoice shows that its hourly rate was $687.50 per hour, and its daily fuel rate was $161.79 per hour. Therefore, our review of the record demonstrates that the jury overcompensated Diamondback by $13,588.64, represented formulaically as ($687.50 x 16 hours of production phase drilling) + ($161.79 x 16 hours of production phase fuel consumption).

_____
[12] The daily drilling report cycle begins at 6:00 a.m. every morning.

17

The remaining expenses Diamondback identified in Exhibit 61 on September 30th represent relatively small amounts of daily expenses it would have incurred on the rig that day irrespective of whether it started production phase drilling. For example, these expenses are reflected each day in Exhibit 61 in the same amounts for general operations on the drilling site, such as trailer, water, trash, sewer, generator, intercom system, and mud logging expenses. To complicate matters, the invoices in Exhibit 60A were typically presented by the vendor to Diamondback after completing all work on the replacement well project as a single invoice. Diamondback itemized the expenses for each invoice on a per diem basis in Exhibit 61. Finally, it appears that Diamondback simply made a mistake when it included the full daily rate for the J.B. Hunt drilling crew. This is apparent from the record because Diamondback did not include the full amount for Cathedral Energy Service's daily directional drilling rate—it sought only $75.00 of the $9,075.00 billed by Cathedral for its drilling services that day.

As set out above, the record contains some evidence of replacement damages, but does not support the full award. *See **ERI Consulting Eng'rs, Inc. v. Swinnea***, 318 S.W.3d 867, 877–78, 880 (Tex. 2010) (holding that evidence was legally insufficient to support amount of lost profit damages awarded by trial court, but there was "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals to consider suggestion of remittitur); ***Aquaplex, Inc. v. Rancho La Valencia, Inc.***, 297 S.W.3d 768, 777 (Tex. 2009) (holding that some evidence supported award of damages, but not at level awarded by trial court, and remanding to court of appeals to determine whether to remand for new trial on damages or suggest remittitur).

Because the evidence is legally and factually sufficient to support some, but not all of the damages awarded by the jury, we suggest a remittitur of replacement damages from $587,176.97 to $573,588.33, which would consequently reduce the total actual damages from $824,137.97 to $810,549.33. If Permian timely files the remittitur, we will reform and affirm that portion of the judgment. *See* TEX. R. APP. P. 46.3; ***Akin, Gump, Strauss, Hauer & Feld, L.L.P.***, 299 S.W.3d at 124. However, if Permian does not timely file the remittitur, we will reverse that portion of the judgment and remand for a new trial on damages. *See **id.***

Permian's fourth issue is sustained in part and overruled in part.

Permian contends in its fifth issue that the trial court's awards of trial and appellate attorneys' fees are legally and factually insufficient.

**Standard of Review**

An award of attorneys' fees rests in the discretion of the trial court. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012). A trial court abuses that discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles, or if its decision is not supported by legally or factually sufficient evidence. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *see also Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991) (explaining that legal and factual sufficiency of evidence are relevant factors in determining whether trial court abused its discretion). In reviewing a fee award, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion, and (2) erred in its application of that discretion. *Grotewold v. Meyer*, 457 S.W.3d 531, 533–34 (Tex. App.–Houston [1st Dist.] 2015, no pet.).

In reviewing a trial court's findings of fact for legal and factual sufficiency of the evidence, we apply the same standards as those applied in reviewing the evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When the appellate record contains a reporter's record as it does in this case, findings of fact are not conclusive on appeal if the contrary is established as a matter of law or if there is no evidence to support the findings. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 257 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

When the appellant challenges the legal sufficiency of the evidence to support a finding on which it did not have the burden of proof at trial, the appellant must demonstrate on appeal that no evidence exists to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

By contrast, when an appellant challenges the factual sufficiency of the evidence on an issue on which it did not have the burden of proof, the appellant must demonstrate the evidence is insufficient to support the adverse finding. *Croucher*, 660 S.W.2d at 58. In reviewing this point, we consider, weigh, and examine all the evidence presented at trial. *Plas–Tex, Inc.*, 772

19

S.W.2d at 445. We set aside a finding for factual insufficiency only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176.

We independently evaluate the trial court's conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts. *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 430 (Tex. 2011). We must uphold the trial court's conclusions of law if any legal theory supported by the evidence sustains the judgment. *Inwood Nat'l Bank v. Wells Fargo Bank, N.A.*, 463 S.W.3d 228, 234–35 (Tex. App.—Dallas 2015, no pet.).

## Applicable Law

A successful claimant recovering damages on an oral or written contract may recover reasonable attorney's fees from an individual or corporation. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015). Under section 38.001, the trial court has no discretion to deny attorney's fees when presented with evidence of the same. *Bocquet*, 972 S.W.2d at 20. If trial attorney's fees are mandatory under section 38.001, then appellate attorney's fees are also mandatory when proof of reasonable fees is presented. *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015).

A party seeking the recovery of an attorney's fee award bears the burden of proving the amount of the fees and their reasonableness. *See El Apple*, 370 S.W.3d at 762–63. To establish the amount of the fees, the proof should include: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked. *Id.* at 763.

Texas courts traditionally assess the reasonableness of an attorney's fee request by assessing several nonexclusive factors. *See id.* at 761 (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b)); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). These include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.*

A party seeking to recover attorney's fees must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id.* at 313. However, the party is not required to segregate fees between claims when discrete legal services advance both recoverable and unrecoverable claims. *Id.* at 313–14. Nonetheless, intertwined facts do not make tort fees recoverable. *Id.* at 313.

In *Chapa*, for example, the party's claims were all dependent upon the same set of facts and circumstances, but this did not mean all the claims "required the same research, discovery, proof, or legal expertise." *Id.* at 313. If a discrete legal service does not advance a claim for which fees are recoverable, then the fee for that service must be segregated and disregarded even if it is nominal. *See id.* at 313–14. Under the *Chapa* test, "[t]he party seeking to recover attorney's fees has the burden of demonstrating that fee segregation is not required." *Messier v. Messier*, 458 S.W.3d 155, 169 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Whether fees must be segregated is generally a question of law, and the extent to which certain claims can or cannot be segregated is usually "a mixed question of law and fact for the jury." *Chapa*, 212 S.W.3d at 312-13.

**Sufficiency of Caraway's Affidavit and Diamondback's General Fee Request**

Diamondback pleaded claims for breach of contract and negligence. It also pleaded for recovery of its reasonable attorneys' fees under Chapter 38.[13] After presenting its case at trial, Diamondback nonsuited its negligence claim, and the trial court submitted only Diamondback's breach of contract claim to the jury. By agreement, the parties tried Diamondback's claim for attorneys' fees to the court by affidavit. Diamondback, as the prevailing party, filed Bill B.

---

[13] Diamondback did not plead for the recovery of attorneys' fees under the MSA attorneys' fee provision.

21

Caraway's affidavit and redacted billing statements to support its claim for fees. Permian objected to the affidavit and the billing statements. Diamondback supplemented Caraway's affidavit and provided unredacted versions of the billing statements. Permian filed further objections to Caraway's supplemental affidavit and the unredacted billing statements.

Diamondback attempted to prove its attorneys' fees under the traditional method in contract cases, as well as under the lodestar method.[14] That is, it provided evidence of the reasonableness of its attorneys' fee request in Caraway's affidavit under the *Arthur Anderson* factors. Caraway also detailed in his affidavit a request for a total amount of fees, along with the hourly rates of the attorneys and paralegals working the case. He attached detailed billing invoices describing the work performed, who performed it, when it was performed, the amount of time spent conducting the task, and the applicable hourly rate. *See El Apple*, 370 S.W. 3d at 760, 764.

Permian first argues that Caraway's affidavit failed to sufficiently address the second, fifth, and seventh *Arthur Anderson* factors. The trial court is not required to receive evidence on all of the factors. *See Hagedorn v. Tisdale*, 73 S.W.3d 341, 353 (Tex. App.—Amarillo 2002, no pet.). The court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. *See id.*

As it relates to the seventh factor, Permian appears to argue that Caraway only included his résumé and not those of the other attorneys and paralegals working the case, or otherwise describe with sufficient specificity their experience to support the fee request. However, we are unaware of a specific requirement that the résumés of all attorneys and paralegals within a firm be attached to an affidavit. *See id.*; *John Moore Servs., Inc. v. Better Bus. Bureau of Metro. Houston Inc.*, No. 01-14-00906-CV, 2016 WL 3162206, at *1, 7 (Tex. App.—Houston [1st Dist.] June 2, 2016, no pet.) (mem. op.) (implicitly holding that résumé of lead attorney was sufficient). Caraway identified the attorneys, paralegals, and their rates. With respect to the paralegals, Caraway stated that they (1) are qualified by education, experience, and training to

---

[14] Diamondback elected to prove its entitlement to fees under both methods due to uncertainties in the caselaw concerning whether the elevated lodestar proof standards apply in Texas Civil Practice and Remedies Code Chapter 38 breach of contract cases, and also whether a Chapter 38 fee applicant is entitled to usual presumptions and judicial notice of reasonable fees where it proves fees under the lodestar method. *See, e.g., Helms v. Swansen*, No. 12-14-00280-CV, 2016 WL 1730737, at *7 (Tex. App.—Tyler Apr. 29, 2016, pet. denied) (mem. op.) (citing cases discussing this issue). We need not decide that issue in this opinion.

perform the services required, (2) have knowledge of the legal system, principles, and procedures, (3) were supervised by an attorney, (4) performed tasks that are traditionally done by an attorney, and (5) performed services that were reasonable and necessary. He also explained that the rates for each attorney and paralegal are the usual and customary fees charged for similar matters in Midland County, Texas, considering the attorneys' and paralegals' experience, reputations, education, work experience, and abilities. Even brief testimony on fees is not "merely conclusory," and constitutes some evidence of reasonable fees, where the party challenging fees did not cross-examine the attorney or present any additional or controverting evidence on the issue of attorneys' fees. *See* **Garcia v. Gomez**, 319 S.W.3d 638, 641 (Tex. 2010).

Permian also notes that Diamondback's attorneys billed many different services together in a single entry, and that this practice of block billing is improper. Block billing is not per se improper, so long as the entries provide meaningful review and are detailed enough to provide some indication of the time spent on various parts of the case. *See* **State Farm Lloyds v. Hanson**, 500 S.W.3d 84, 100 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing **John Moore Servs., Inc.** 2016 WL 3162206, at \*6-7). Diamondback submitted over 100 pages of detailed billing invoices, and Permian does not identify with specificity the billing entries of which it complains in this regard.

Permian next contends that Caraway's affidavit does not provide sufficient evidence as to the reasonableness of Diamondback's fee request. As we have stated, Caraway explained that the hourly rates of the attorneys and legal support staff at both law firms working on the case are reasonable and consistent with the rates customarily charged in Midland County, Texas based on each attorney's experience, reputation, and ability, and each assistant's education and work experience.[15] Caraway explained that the fees charged take into account those customarily charged in the area by attorneys for the same or similar services with similar levels of experience, reputation, and ability, considering the nature and complexity of the matters in controversy, time limitations imposed, and the results obtained.

Caraway explained that his firm handles several matters for Diamondback and that both firms expended significant labor in this case. He stated that the case involved complex legal and

---

[15] Although there were invoices from two law firms that represented Diamondback, the attorneys at one of those firms working on this case joined Caraway's firm in October 2014.

23

factual matters including a significant amount of background and legal research work and analysis. Caraway explained that he has experience with cases of similar complexity and involving similar amounts of money. He stated that bringing this matter to trial involved numerous communications with opposing counsel, along with extensive discovery, including the review of over 6,000 pages of documents produced between the parties in discovery. Caraway also described how significant time was spent in developing a working knowledge of the parties' disputes. Caraway noted that this controversy involved a large sum of money that required extensive focus by the attorneys and support staff of both firms. Caraway also attached his résumé, which shows that he is a partner at a large law firm and has extensive experience in representing clients in the oil and gas industry on a wide range of issues, including those involved in this case. He also attached over 100 pages of detailed billing records describing the work performed, who performed it, when it was performed, the length of time spent performing the service, the applicable rate, and the amount charged for the service. Consequently, generally speaking, the trial court had sufficient evidence to support the award of Diamondback's fees.

## Segregation of Unrecoverable Fees

Permian also challenges Diamondback's failure to segregate fees for services performed on claims for which attorneys' fees are unrecoverable. In Permian's objections to Diamondback's request for attorneys' fees, it attached Exhibit A, which contains entries from Diamondback's billing invoices that Permian argues are unrecoverable because they do not advance Diamondback's breach of contract claim.[16] Permian, in Exhibit A, contends that the total amount of unrecoverable attorneys' fees is $20,204.50.

The burden is on Diamondback to segregate fees when required, and the determination of whether segregation is necessary is generally a question of law. *See Chapa*, 212 S.W.3d at 312-13; *Messier*, 458 S.W.3d at 169. Caraway, in his affidavit, stated that

> I am aware of the requirement that attorneys' fees be segregated among claims for which attorneys' fees are and are not recoverable. I believe the [amount of attorneys' fees requested] represent the total amount of attorneys fees recoverable, as I believe that none of the fees incurred relate solely to claims for which attorneys' fees are unrecoverable, and that all legal services rendered by [Diamondback's attorneys] advance a claim in which the recovery of attorneys' fees is permitted.

---

[16] The document attaching Exhibit A is identified as "[Permian's] Reply to [Diamondback's] Response to [Permian's] Sur-Reply."

24

Permian objected and provided its Exhibit A, which itemized each of its challenges to Diamondback's unsegregated fee request. Caraway provided no further explanation or analysis on segregation of fees. The trial court found that "[a]ll fees for legal services rendered in this case are recoverable and permitted; thus, there is no requirement that fees be segregated among claims for which fees are recoverable and not recoverable." The trial court also overruled Permian's objections.

Our review of Permian's Exhibit A shows that at least some of the billing entries do not relate solely to the breach of contract claim. Therefore, the law required Diamondback to segregate its unrecoverable fees unless those discrete legal services also advanced its breach of contract claim. *See Chapa*, 212 S.W.3d at 313-14. Diamondback failed in this regard. For example, one of the billing entries describes the work as, "[r]esearch ability to tender money into court in order to void mineral liens or potential mineral liens." Another entry described the work as, "[r]eview and revise open records letter to Department of Public Safety." Many of the other billing entries relate to insurance coverage. Some of those services may be recoverable, but after challenged by Permian, Diamondback made no effort to show that the services relate solely to a recoverable claim or otherwise advanced a recoverable claim. Diamondback had the burden to show that segregation was not required, and we are unable to discern how the entries in Exhibit A relate to or advance a recoverable claim. *See CA Partners v. Spears*, 274 S.W.3d 51, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (reversing award of attorney's fees even though attorney testified that no segregation was required, but attorney "failed to articulate how the legal services that she performed advanced both recoverable and unrecoverable claims").

No matter how nominal, an unrecoverable fee that does not advance a recoverable claim must be segregated from the request for attorneys' fees. *See Chapa*, 212 S.W.3d at 313. The appropriate remedy is to remand for a determination on the amount of fees that should be segregated. *See id.* at 314 (holding that remand is appropriate when evidence is legally insufficient to support entire unsegregated attorney's fees award because that award is nevertheless some evidence of segregated attorney's fees).

## Appellate Attorneys' Fees

Finally, Permian contends that the evidence is insufficient to support the trial court's award of conditional appellate attorneys' fees.

Caraway, in his affidavit, stated that he estimated attorneys' fees to respond to an appeal, and to prepare for and present oral argument based upon the hourly rate of the appellate attorneys at his firm, which ranged from $200 to $600 per hour, at $150,000.00 for representation at the court of appeals, $50,000.00 for representation through the petition for review phase at the Texas Supreme Court, and $25,000 for representation through oral argument and the conclusion of the case at the Texas Supreme Court. Caraway based his opinion as to the reasonableness of appellate fees on the same rationale as the reasonableness of trial court fees described above. For example, he described the large amount of money in controversy, the complexity of the issues, and the extensive work required. He also concluded that the amount of appellate fees were reasonable.

Permian provided no controverting evidence to the trial court, such as its own expert affidavit. Nor did it object to the evidence of appellate attorneys' fees or otherwise argue that the amount of appellate fees awarded by the trial court was excessive or unreasonable. It generally stated that the evidence was insufficient to support the trial court's award of attorneys' fees in its postjudgment motions. So, although Permian preserved its complaint on this ground, it did not controvert Diamondback's evidence supporting appellate attorneys' fees.

While the uncontroverted testimony of an interested witness generally does nothing more than create a fact issue, such testimony is taken as true as a matter of law if it is not contradicted by any other witness or by attendant circumstances and is clear, direct, positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion on it. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). This exception to the interested witness rule is especially true when opponents have the means and opportunity of disproving the testimony if it is not true and fail to do so. *Id.* Even if the evidence is uncontroverted, "if it is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact." *Id.*

Caraway's uncontroverted affidavit, taken as true, provides legally sufficient evidence to support the trial court's finding awarding appellate attorneys' fees in those amounts. We cannot say that the affidavit is conclusory. *See Garcia*, 319 S.W.3d at 641 (even brief testimony is not "merely conclusory," and constitutes legally sufficient evidence, where party did not cross-examine the attorney or present any additional or controverting evidence on issue of attorney's fees); *State & County Mut. Fire Ins. Co. ex rel. S. United Gen. Agency of Tex. v. Walker*, 228

S.W.3d 404, 409–10 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence sufficient to support appellate attorney's fees when uncontroverted). This is especially true when, as here, opposing counsel likewise has some idea of the time and effort involved and if the matter is truly in dispute, may effectively controvert the reasonableness of the fee request. *See **Ihnfeldt v. Reagan***, No. 02-14-00220-CV, 2016 WL 7010922, at \*16 (Tex. App.—Fort Worth Dec. 1, 2016, pet. denied) (mem. op.).

Moreover, even if we were to conclude that the amounts were unreasonable, incredible, or questionable, it would raise only a fact issue. The trial court found the appellate attorneys' fees to be reasonable. Diamondback sought an amount of nearly half of its fees at the trial court level to respond to the appeal in this court, and over two-thirds of its trial court fees in total appellate attorneys' fees should the matter go through oral argument at the Texas Supreme Court. While these amounts of up to $225,000.00 to respond to an appeal might seem excessive when compared to the amount of legal work incurred from presuit investigation through trial, Permian raised several issues in this appeal with many subparts, requiring extensive research, analysis, and briefing. We cannot say that the trial court abused its discretion in awarding appellate attorneys' fees in those amounts or that the fee is so excessive as to be manifestly unjust.

Permian's fifth issue is sustained in part and overruled in part.

## DISPOSITION

We have overruled Permian's first, second, and third issues. We have sustained the portion of Permian's fourth issue relating to Diamondback's recovery of replacement damages. Consequently, we *reverse* the portion of the trial court's judgment awarding $587,176.97 in replacement damages and suggest a *remittitur* in the amount of $13,588.64, resulting in $573,588.33 in replacement damages, thereby reducing total actual damages to $810,549.33. If Diamondback timely files the remittitur in the trial court within fifteen days of the date of this opinion, that portion of the trial court's judgment will be reformed and affirmed. *See* TEX. R. APP. P. 46.3; ***Akin, Gump, Strauss, Hauer & Feld, L.L.P.***, 299 S.W.3d at 124. However, if Permian does not timely file the remittitur, we will *reverse* that portion of the judgment and *remand* for a new trial on damages. *See id.* We have also sustained the portion of Permian's fifth issue relating to Diamondback's failure to segregate its attorneys' fees. Therefore, we

27

*reverse* the portion of the judgment awarding $319,761.50 in attorneys' fees incurred through representation at the trial court level, and *remand* the cause to the trial court for a determination of the amount of attorneys' fees to be segregated. *See Chapa*, 212 S.W.3d at 314. We *affirm* the trial court's judgment in all other respects.

**BRIAN HOYLE**
Justice

Opinion delivered May 31, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

28



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 31, 2017**

**NO. 12-16-00092-CV**

**PERMIAN POWER TONG, INC.,**
Appellant
V.
**DIAMONDBACK E&P, LLC,**
Appellee

Appeal from the 441st District Court

of Midland County, Texas (Tr.Ct.No. CV-49854)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that there was error in the judgment of the court below insofar as the trial court's judgment awarded $587,176.97 in replacement damages and $319,761.50 in attorneys' fees.

It is therefore ORDERED, ADJUDGED, and DECREED that the portion of the trial court's judgment awarding $587,176.97 in replacement damages be **reversed** and suggest a *remittitur* in the amount of $13,588.64, resulting in $573,588.33 in replacement damages, thereby reducing total actual damages to $810,549.33. If Appellant timely files the remittitur in the trial court within *fifteen days* of the date of this opinion, that portion of the trial court's judgment will be **reformed** and **affirmed**. If Appellant does not timely file the remittitur, we **reverse** that portion of the judgment and **remand** for a new trial on damages.

It is therefore ORDERED, ADJUDGED, AND DECREED that the portion of the judgment awarding $319,761.50 in attorneys' fees incurred through representation at the trial court level be **reversed** and the cause **remanded** to the trial court for a determination of the amount of attorneys' fees to be segregated.

It is further ORDERED, ADJUDGED and DECREED that, in all other respects, the trial court's judgment is **affirmed**; all costs of this appeal be assessed one-half against the Appellant, **PERMIAN POWER TONG, INC.,** and one-half against the Appellee, **DIAMONDBACK E&P, LLC,** for which execution may issue; and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.

*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*