**Affirmed and Memorandum Opinion filed October 27, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00623-CV

---

### Z.M. SHAY JAYADAM3, LLC, LONESTAR BLENDING, INC., NEW FLUID SOLUTIONS, INC., ZOHREH SHAARPOUR, AND MANOCHER SHAARPOUR, Appellants

### V.

### OMNOVA SOLUTIONS, INC., Appellee

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2015-59978**

---

## MEMORANDUM OPINION

In this breach of contract case Z.M. Shayjayadam3, LLC, Lonestar Blending, Inc., New Fluid Solutions, Inc., Zohreh Shaarpour, and Manocher Shaarpour (collectively "Sellers") appeal a judgment following a bench trial. In five issues Sellers argue the trial court erred by (1) failing to follow the precedent of *Mercedes-*

*Benz v. Carduco*;[1] (2) finding Sellers breached representations and warranties in the Asset Purchase Agreement ("APA"); (3) finding Sellers failed to establish affirmative defenses, including mitigation of damages; (4) issuing a joint and several judgment as to all Sellers when there were no findings to support claims against Ms. Zohreh Shaarpour individually; and (5) denying Sellers' counterclaims. Concluding the evidence is legally sufficient to support the trial court's judgment, we affirm.

## BACKGROUND

Shaarpour and his wife Zohreh Shaarpour owned three companies: Z.M. Shayjayadam3, LLC, New Fluid Solutions ("NFS"), and Lonestar Blending, Inc. Z.M. Shayjayadam3, LLC was a vehicle to hold real estate for NFS; Lonestar Blending was used to hold a blending facility, and NFS was the operating company formed by Shaarpour in 2004 to sell drilling fluids and other products related to the oil and gas industry. At trial all three companies were referred to collectively as NFS.

In 2014, NFS was interested in selling its assets and began discussions with Omnova about a potential sale. Jeff Chaapel, general manager of oil and gas, and Jim LeMay, Vice President Corporate Development and general counsel for Omnova, were contacted by a broker about purchasing NFS. Chaapel knew of NFS and its products from his time working at Baker Hughes but had not met Shaarpour. In early 2015 the parties entered into a letter of intent and Omnova was conducting its due diligence with regard to the purchase of NFS's assets targeting a closing date in May. Chaapel received information from NFS that its April 2015 sales invoices totaled under $77,000, which was significantly lower than NFS's historical monthly revenue. The April sales data put the purchase of NFS "in jeopardy." Omnova decided to delay the transaction to see if May 2015 sales followed the same

---

[1] 583 S.W.3d 553, 559 (Tex. 2019).

downward trend.

Chaapel testified that Shaarpour, while reporting sales of under $77,000 in April, also reported "booked sales" for the same month as $344,000. This discrepancy caused Omnova to be concerned about why all of NFS's orders did not ship. Chaapel assumed the orders that did not ship in April would carry over to May. Chaapel asked Shaarpour to provide more detail on the April sales and to estimate May and June sales. On May 19, 2015, Chaapel sent an email to LeMay stating that he had met with Shaarpour that day and Shaarpour "stated he will hit a minimum of $429k this month, adding up what has shipped MTD, and what is being prepared for pickup. He stated a high likelihood of surpassing $500k." Chaapel testified that he understood "what has shipped M[onth] T[o] D[ate]" included closed business, not estimates or guesses. Similarly, Chaapel understood "what is being prepared for pickup" included items that had been ordered, not estimates, guesses, or forecasts.

On May 27, 2015, Chaapel emailed Shaarpour and asked for "a breakdown of what has shipped Month-to-Date" and "what is scheduled to ship between now and the end of the month, and some detail around how June is shaping up (any legitimate orders, inquiries, carryover, etc.)" Chaapel told Shaarpour that these figures were critical to closing the deal. The next day, May 28, Shaarpour gave Chaapel a document titled, NFS Sales by Customer Summary ("NFS Sales Summary"). The document provided the following sales:

| | |
|---|---|
| Abrill, Inc. | 80,100 |
| Borehole Control | 60,016 |
| BRI-CHEM | 128,660 |
| Cesi Chemicals | 15,950 |
| ORS Fluids LLC | 10,950 |
| **Total Invoiced** | **295,676** |

Pending:

| | |
|---|---|
| Borehole | 95,000 |
| Tactical | 68,000 |
| Greenwell | 48,000 |
| Flexlife | 87,000 |
| **Total Pending** | **298,000** |

For the month of June, all numbers are the same, safe estimate.

Shaarpour and Chaapel met on May 28 to go over the figures in the NFS Sales Summary. Shaarpour told Chaapel that the "Total Invoiced" figure reflected "material that had shipped," and the "Total Pending" section included "forthcoming orders." Shaarpour did not disclose that when he generated the invoice for Abrill the buyer had not yet decided to place an order. Abrill never purchased any product from NFS.

The sale of assets closed on June 4, 2015 with the execution of the APA. Shortly after closing on the APA Omnova learned that Sellers misrepresented their revenues and customer base.

After the closing date the first anomaly Omnova noticed was that Bri-Chem had only been invoiced $7,660 rather than $128,660 as reflected on the NFS Sales Summary. When asked to explain the discrepancy, Shaarpour explained that Bri-Chem had canceled a purchase order. Chaapel contacted Bri-Chem and was told that they did not cancel any purchase orders. Bri-Chem assured Chaapel that if they had canceled any purchase orders, they would have a record of it. When confronted later on June 22, Shaarpour told Chaapel that there were no outstanding purchase orders and the number he had listed was his best guess.

Shaarpour testified that NFS was "hoping to invoice [$129,000], but it didn't happen." Shaarpour testified in his deposition and at trial that the "Pending" section

4

of the sales summary was created through inquiries he had received for that month. Shaarpour maintained throughout his testimony that he had never read the APA and did not understand it; he instead relied on his attorneys to review the APA.

The next anomaly occurred the same day when Omnova issued a press release announcing that it had purchased NFS. Schedule 5.23(a) of the APA listed Baker Hughes as one of NFS's "Top 20 Customers and Suppliers." Iain Maley, product line manager at Baker Hughes, notified Dan Bode, director of sales at Omnova, that Baker Hughes had refused to do business with NFS "under any circumstances." The email read as follows:

> You've just jumped into bed with the biggest snake in the oilfield.
>
> I shut them down with Baker, I refuse to do business with New Fluids under any circumstances. Nothing personal but these guys are impossible to work with.
>
> What were Omnova thinking? Everyone here is shocked.

Shaarpour never told Chaapel that Baker Hughes had ceased doing business with NFS before the closing date.

Chaapel's subsequent investigation revealed that none of the items listed in the "Pending" section of the NFS Sales Summary were actually forthcoming orders. In fact, Chaapel found there was no contact with those customers about any of the products.

Omnova produced an exhibit showing customer sales from the closing date through the end of Omnova's fiscal year, November 30, 2015. The NFS Sales Summary listed $95,000 in pending orders from Borehole for the month of May; Omnova's actual sales to Borehole totaled $35,000 for the fiscal year. Two of the other three companies listed with pending orders, Tactical and Flexlife, did not buy any products in May or the rest of the fiscal year. Greenwell did not purchase any

products in May, but placed an order in September for $12,750. Shaarpour projected total sales for May and June at over $1 million; actual sales were under $150,000.

Omnova sued Sellers for fraudulent inducement, statutory fraud, and breach of contract. Sellers filed counterclaims asserting fraudulent inducement, breach of the APA, and breach of the employment agreement. Following a bench trial, the trial court signed a judgment in favor of Omnova, finding (1) Sellers fraudulently induced the APA; (2) Sellers committed statutory fraud; (3) Shaarpour was liable for exemplary damages because Omnova's fraudulent inducement and statutory fraud damages were caused by Shaarpour's fraud or gross negligence; (4) Sellers breached the APA; (5) Sellers did not establish any affirmative defense that would preclude Omnova's recovery; and (6) Sellers did not prove they were entitled to recover on their counterclaims for fraudulent inducement, breach of the APA, or breach of the employment agreement. The trial court entered judgment on Omnova's breach of contract claim finding that, should Omnova's recovery for breach of contract become less favorable for any reason, Omnova may, in the alternative to Omnova's breach of contract claim, recover on any one of the alternative theories of statutory fraud or fraudulent inducement. The trial court also signed extensive findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

This case is before us on appeal from a bench trial after which the trial court filed extensive findings of fact and conclusions of law. The record includes the full reporter's record of the trial. Sellers' arguments in their principal brief do not clarify whether they challenge any of the trial court's findings of fact or whether they have asserted legal or factual sufficiency challenges. Their arguments and the relief requested by those arguments, however, consistently seek rendition in their favor, on the grounds that Omnova failed to prove its case as a matter of law. We thus

6

construe Sellers' arguments as asserting legal-sufficiency or "no evidence" challenges. *See Milton M. Cooke Co. v. First Bank & Tr.*, 290 S.W.3d 297, 302 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also Tex. G & S Investments, Inc. v. Constellation Newenergy, Inc.*, 459 S.W.3d 252, 257 n.4 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("In a non-jury case, a party may challenge the legal sufficiency of the evidence for the first time on appeal.").

## I.     Standard of Review

We review the trial court's decision for legal sufficiency of the evidence using the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id*. at 827.

We sustain a legal sufficiency or "no evidence" challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 719 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A party attacking the legal sufficiency of an adverse finding on an issue on which it had the burden of proof must show that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When a party challenges the legal sufficiency of the evidence on a finding on which it did not bear the burden of proof,

the party must show that no evidence supports the finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011); *Sloane v. Goldberg B'Nai B'Rith Towers*, 577 S.W.3d 608, 622 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

We apply these standards mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and we indulge every reasonable inference in support of the factfinder's findings. *See City of Keller*, 168 S.W.3d at 819, 822. When, as here, there is a complete reporter's record of the trial, the trial court's findings of fact will not be disturbed on appeal if there is any evidence of probative force to support them. *See Tendeka, Inc. v. Nine Energy Serv. LLC*, No. 14-18-00018-CV, 2019 WL 6872942, at *5 (Tex. App.—Houston [14th Dist.] Dec. 17, 2019, no pet.) (mem. op.); *Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

## II. Legally sufficient evidence supports the trial court's findings that Sellers breached the contract.

To recover on a breach of contract claim, a claimant must prove: (1) the existence of a valid contract; (2) the claimant performed or tendered performance; (3) the other party breached the contract; and (4) the claimant was damaged as a result of the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018). *Joselevitz v. Roane*, No. 14-18-00172-CV, 2020 WL 1528020, at *4 (Tex. App.—Houston [14th Dist.] Mar. 31, 2020, no pet.) (mem. op.).

In Sellers' second issue they challenge Omnova's evidence to support the third element, i.e., Sellers argue there was no evidence that they breached representations and warranties in the APA.

The trial court found Sellers breached the following representations and warranties in the APA: (1) section 5.12, which represented that there had been no

change in Sellers' financial condition since December 31, 2014; (2) section 5.20, which represented that there had been no Seller Material Adverse Effect, including loss of or material order cancellation by any major customer or supplier of Sellers; (3) section 5.23(b), which represented that Sellers were not engaged in a material dispute with any customer or supplier and no customer or supplier intended to cease doing business or materially reduce their business with NFS. The trial court further found that Shaarpour breached his employment agreement with Omnova, which was a part of the APA. Sellers allege there was no evidence to support those findings. We address Sellers' arguments in turn.

### A.    Sections 5.12, 5.20, and 5.23(b) of the APA.

The trial court found that Sellers breached sections 5.12, 5.20, and 5.23(b) of the APA, which state:

> **5.12**. Since the Financial Statement Date, there has been no change in the financial condition of the Sellers and no event, circumstance or fact has occurred that will, or can reasonably be expected to, result in a Seller Material Adverse Effect.

> **5.20.** No Changes. Except as set forth in Schedule 5.20, since the Financial Statement Date, (i) there has not been any Seller Material Adverse Effect or as a result of Closing will give rise to a Buyer Material Adverse Effect and (ii) there has not been (in each case relating to the Business or the Purchased Assets): . . .

> (g) receipt or notice that there has been a loss of, or material order cancellation by, any major customer or supplier of the Sellers[.]

> **5.23(b)**. [T]o the knowledge of Sellers (i) they are not engaged in any material dispute with any customer or supplier and (ii) no customer or supplier of the Sellers intends to cease doing, or materially reduce its, business with the Sellers (or the Buyer after the Closing).

The trial court found that Sellers "knowingly and intentionally made a series of misrepresentations and omissions about NFS's financial condition, including its

9

historical and estimated sales, beginning no later than May 4, 2015 and continuing up to the execution of the APA." The court further found that Shaarpour represented to Omnova that NFS had "total sales booked" of $344,000 for the month of April 2015 when in reality NFS had invoiced only $76, 973. Shaarpour also misrepresented that orders booked in April, but not yet invoiced, would carry over to May. The trial court also found that Shaarpour misrepresented that NFS "can sell $577,000.00 in the month of May including the carryover from April." Shaarpour misrepresented that NFS would reach of minimum of $429,000 in May revenues based on what had already shipped and was projected to surpass $500,000 for the month.

The trial court further found that Shaarpour misrepresented to Omnova the actual May 2015 sales, the existence of pending sales, and actual inquiries from NFS customers for May in the NFS Sales Summary. The court found that Shaarpour misrepresented anticipated June 2015 sales performance both verbally and in writing. The trial court found the NFS Sales Summary misrepresented as "Invoiced," sales that had not, in fact, been invoiced and as "Pending," sales that were not pending and were not based on actual customer inquiries.

The trial court concluded that "Shaarpour and NFS breached section 5.12 by misrepresenting or failing to disclose material facts regarding NFS's May 2015 performance, the state of the pipeline for June, and other material information about major customers." The court further concluded that Sellers "breached section 5.12 by failing to disclose that NFS had lost the business of major customers who were reasonably expected to contribute significantly to NFS's financial performance."

### 1. Seller Material Adverse Effect

Sellers first argue there is no evidence of a "Seller Material Adverse Effect." Section 5.01 of the APA defined Seller Material Adverse Effect as, "a material

adverse effect on the consolidated assets, liabilities, financial condition or results of operations of the Sellers, the conduct of the Business or the ownership of the Purchased Assets."

As detailed above, Shaarpour materially misrepresented invoiced sales for the month of May and projected sales for June. After the closing date of the APA, Omnova learned that Bri-Chem had only been invoiced $7,660 rather than $128,660 as reflected on NFS's sales summary. When asked to explain the discrepancy, Shaarpour explained that Bri-Chem had canceled a purchase order. Chaapel contacted Bri-Chem and was told that they did not cancel any purchase orders and that if they had canceled any purchase orders, they would have a record of it. When confronted later on June 22, Shaarpour told Chaapel that there were no outstanding purchase orders and the number he had listed was his best guess.

Sam Khosh, technical adviser for NFS, testified that the sales numbers for the month of May that were listed in the NFS Sales Summary would have been potential sales in a "good month." Khosh testified those figures were not "good or safe estimate[s]" for what would actually happen in May 2015.

Shaarpour testified that NFS was "hoping to invoice [$129,000], but it didn't happen." Shaarpour testified in his deposition and at trial that the "pending" section of the NFS Sales Summary was created through inquiries he had received for that month.

The NFS Sales Summary also listed an invoiced amount for Abrill of $80,100. Shaarpour testified, and Omnova admitted copies of emails that showed, no customer had actually placed an order in the amount of $80,100. Shaarpour testified that Abrill was an international customer and required an "invoice" before it would place an order. Shaarpour misrepresented this invoice as an amount that had been paid in April.

Chaapel's subsequent investigation revealed that none of the items listed in the "pending" section of the NFS Sales Summary were actually forthcoming orders. In fact, Chaapel found there was no contact with those customers about any of the products.

## 2. Loss of Customers

In addition to the Seller Material Adverse Effect, the trial court found that NFS misrepresented its customer base. In Schedule 5.23(a) of the APA, NFS listed its "Top 20 Customers and Suppliers," including Terrakem and Baker Hughes. The trial court found that Shaarpour falsely represented to Omnova that Terrakem had made a specific inquiry for the purchase of $250,000 of NFS's Shalecapsule product for June 2015. The trial court found that Shaarpour made material misrepresentations about NFS's relationship with two large customers: Saudi Aramco and Baker Hughes.

Terrakem was one of the companies listed on the NFS Sales Summary as an invoiced customer in addition to being listed as a Top 20 customer. Shaarpour forecasted sales to Terrakem at $150,000 in May, $100,000 in June, $100,000 in the third quarter, and $75,000 in the fourth quarter. Shaarpour told Chaapel that Terrakem was finalizing a contract with Pemex, a Mexican national oil company. Shaarpour was optimistic that NFS would be selling significant volume of a product called Shalescapsule to Terrakem.

Chaapel later learned that the day before he met with Shaarpour, May 27, Shaarpour received an email from a representative at Terrakem. The email said, "All is well but we are having to wait on contract. Can you sell the inventory I have there with you? This has been an unneccessary [sic] drain on cash flow." The inventory that Terrakem asked Shaarpour to sell was worth $250,000. Shaarpour did not disclose Terrakem's contract delay or its request to liquidate inventory to Omnova.

Terrakem did not buy any products for the rest of the fiscal year.

Shaarpour admitted at trial that the Terrakem figures were "completely inaccurate" because "Terrakem didn't even want the inventory it currently had sitting in [NFS's] warehouse." Shaarpour described the "Terrakem numbers" as "pure projection."

Sellers represented in the contract that Baker Hughes was one of NFS's top 20 clients in 2014 and the first four months of 2015. They also represented that no client was going to cease doing business or materially reduce their business.

As noted above, Omnova learned on the closing day that Baker Hughes had refused to do business with NFS "under any circumstances." Contrary to the Baker Hughes' email, Shaarpour never told Chaapel that Baker Hughes had ceased doing business with NFS.

Aramco was another company listed in Schedule 5.23(a) as a "Top 20" customer. The trial court found that Shaarpour represented to Omnova that NFS had submitted bids to Aramco and "had a 98-99% chance" of securing a contract in connection with those bids. The trial court found those "representations were false." Sellers do not challenge this finding on appeal. Unchallenged fact findings are binding on us "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)

Sellers argue that Omnova's Chief Financial Officer admitted that NFS's business was improving and they were not making a mistake by entering into the transaction. Specifically, Sellers refer to an email response from Paul DeSantis, Omnova CFO, to LeMay on May 28, 2015, the same day Shaarpour gave Chaapel the NFS Sales Summary. LeMay wrote DeSantis, and other executives at Omnova

after receiving the NFS Sales Summary from Shaarpour: "Trending improvement, but not all that we hoped for." DeSantis responded:

> No acquisition is perfect. Let's not get too hung up on the numbers for May–the business is improving and there are some gems in there. Let's declare victory, buy it and start holding [Chaapel] accountable for delivery. I do not think we are making a mistake in any way by doing this. The assets are worth practically the value of the acquisition.

Sellers argue this email shows that Omnova was not concerned with the misrepresentations made in the NFS Sales Summary. It is important to note that DeSantis's email was sent before the closing date when the APA was signed. It was not until after this date that Omnova discovered the "numbers for May," relied on by Omnova, were false.

Reviewing the evidence under the appropriate standard of review, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not we conclude there was evidence of probative force to support the trial court's findings of breach of the APA.

## B. Shaarpour's Employment Contract with Omnova

Sellers allege there is no evidence to support the trial court's finding that Shaarpour did not want to be an Omnova employee. Sellers further argue that there is no evidence to support the finding that Shaarpour breached his employment agreement because the findings of breach are based on "alleged pre-closing disclosures," which Sellers argue were not actionable. Finally, Sellers argue that the trial court cited no damage figures for breach of the employment agreement; therefore, the trial court erred in awarding any damages as a result.

The trial court found that Shaarpour signed his employment agreement, but refused to sign employment documents, and had no intent to honor his employment agreement at the time he signed it. The trial court further found that the employment

14

agreement obligated Shaarpour to abide by Omnova's Business Conduct Policies. The trial court found that Shaarpour violated the Business Conduct Policies by misrepresenting the amount of invoiced sales to Bri-Chem in May and not only failing to correct those misrepresentations after the closing date but making additional misrepresentations in an attempt to conceal the earlier misrepresentations. The trial court also found that during his employment with Omnova Shaarpour misrepresented the status of his relationship with Baker Hughes.

In the trial court's conclusions of law, the trial court concluded that Sellers could not recover on their counterclaim for breach of the employment agreement due to Shaarpour's prior material breach of the agreement. In the final judgment the trial court did not award damages to Omnova for Shaarpour's breach of the employment agreement, but held that Sellers had not established Omnova's breach of the employment agreement.

Sellers argue on appeal that there is no evidence to support the trial court's findings that Shaarpour breached his employment agreement. Sellers do not complain of the portion of the trial court's judgment in which the court found that Sellers failed to prove that they were entitled to recover on their counterclaim for breach of the employment agreement. The finding on Sellers' counterclaim for breach of the employment agreement is the only portion of the trial court's judgment that addressed breach of the employment agreement.

The harmless error rule applies to all alleged error. *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011). Under Rule 44.1(a), as applicable to this case, the trial court's error, if any, is only reversible if it probably caused the rendition of an improper judgment.[2] Tex. R. App. P. 44.1(a)(1). Thus, the rule

---

[2] Sellers make no claim, and the record does not reveal, they were probably prevented from properly presenting their case on appeal. *See* Tex. R. App P. 44.1(a)(2).

15

"establishes a sound and common sense policy of not reversing a judgment unless the error or errors can be said to have contributed in a substantial way to bring about the adverse judgment." *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 819–20 (Tex. 1980). It is the complaining party's burden to show harm on appeal. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009); *Guniganti v. C & S Components Co., Ltd.*, 467 S.W.3d 661, 666 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

While an erroneous finding of fact on an ultimate fact issue is harmful error, an immaterial finding of fact is harmless and not grounds for reversal. *Andrews v. Key*, 13 S.W. 640, 641 (Tex. 1890); *Cooke County Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.–Fort Worth 2004, no pet.); *see also Able v. Able*, 725 S.W.2d 778, 780 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

Sellers do not complain of the portion of the judgment in which the trial court found that they could not recover on their counterclaim for breach of the employment agreement. Sellers admit that the trial court did not award damages on the complained-of findings. Consequently, Sellers have not met their burden to show harmful error. *See Castillo*, 279 S.W.3d at 667; *Guniganti*, 467 S.W.3d at 666. We overrule Sellers' second issue.

III. **The court need not address Sellers' first issue because we have found the evidence is legally sufficient to support the trial court's findings of breach of contract.**

In their first issue Sellers argue that the trial court erred by failing to follow the mandatory authority of *Mercedes-Benz v. Carduco*[3] because the claims of fraud were contradicted by the terms of the APA. The trial court's judgment awards Omnova recovery for breach of contract. Judgment in Omnova's favor on its

---

[3] 583 S.W.3d at 559.

statutory fraud and fraudulent inducement claims was entered only in the alternative "should Omnova's recovery for breach of contract become less favorable for any reason." In their first issue, Sellers attack the trial court's alternative fraud judgment—not the primary judgment for breach of contract.

A party may pursue claims and seek damages on alternative theories of liability. Tex. R. Civ. P. 48; *Waite Hill Servs., Inc. v. World Class Metal Works*, Inc., 959 S.W.2d 182, 184 (Tex. 1998). When we have held that the evidence is legally sufficient to support the trial court's judgment on one of multiple alternative causes of action, it is unnecessary to address the issues that concern alternative theories that might have also served as a basis to affirm the judgment. *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.—Corpus Christi 2001, no pet.); *see also Nw. Mortgage, Inc. v. Salinas*, 999 S.W.2d 846, 865 (Tex. App.—Corpus Christi 1999, pet. denied) (stating that when "the trial court's judgment can be supported on the basis of" one of multiple theories of recovery, "we need not address these remaining points" that address alternative theories of recovery). Accordingly, we need not address Sellers' first issue, which challenges the trial court's fraud findings as alternative bases for the judgment. *See* Tex. R. App. P. 47.1.

## IV. Sellers failed to meet their burden to establish Omnova's failure to mitigate damages.

In their third issue Sellers argue the trial court erred in finding they did not establish the affirmative defense of mitigation of damages. Sellers claim they established Omnova's failure to mitigate its damages as a matter of law because Sellers offered to unwind the transaction and Omnova chose to sue for damages rather than accept Sellers' offer to unwind the transaction.

The concept of mitigation requires the plaintiff to exercise reasonable care in minimizing its damages. *Great Am. Ins. Co. v. North Austin MUD*, 908 S.W.2d 415,

17

426 (Tex. 1995). As the breaching party, Sellers had the burden of proving that damages could have been mitigated. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 135 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The duty to mitigate damages arises only if it can be done with "trifling expense or with reasonable exertions." *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999). The defendants bear the burden to prove failure to mitigate damages; they must prove lack of diligence as well as the amount by which the damages were increased as a result of the failure to mitigate. *Turner v. NJN Cotton Co.*, 485 S.W.3d 513, 523 (Tex. App.—Eastland 2015, pet. denied).

The trial court did not make any specific findings of fact on mitigation of damages. With regard to rescission of the agreement, the trial court found it would be "extremely difficult to unwind the APA." Specifically, the court held that mutual restitution could not be accomplished through Omnova returning the real property, building, and equipment for what it paid. The court found that Omnova invested more than $700,000 in "improving the real property, expanding and renovating the office space and lab facility within the building thereon, and upgrading and modifying the blending facility and associated improvements to meet Omnova's standards." The court further found that Omnova paid an additional $600,000 in transaction costs in addition to the purchase price. Although Shaarpour testified that he was generally willing to unwind the transaction he also testified he was unwilling to pay Omnova's losses resulting from its acquisition.

The trial court's findings were supported by legally sufficient evidence. Although Shaarpour testified that he offered to unwind the transaction other evidence contradicted Shaarpour's testimony. Chaapel testified that during the meeting in which he confronted Shaarpour with the results of his investigation, Shaarpour briefly mentioned that he was willing to unwind the deal. Shaarpour,

18

however, withdrew his offer within seconds. Chaapel testified that he never considered the offer to be legitimate, and that it was never reiterated after that day. LeMay testified that none of the Sellers addressed an offer to unwind the transaction to him. Shaarpour testified that he was never willing to compensate Omnova for the $600,000 of transaction costs incurred in connection with the acquisition. Sellers also introduced a "settlement offer" into evidence at trial in which Sellers' counsel stated, "[w]e cannot unwind the entire transaction" because the intellectual property and other intangible property "cannot be rescinded."

Because Sellers bore the burden of proof on this affirmative defense, they must show that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241. Sellers cite to no evidence in the record, nor have we found any, to contradict the findings by the trial court. Sellers failed to meet their burden to present evidence to show the amount by which damages were increased as a result of Omnova's alleged failure to mitigate.

## V. The trial court did not err in finding Sellers jointly and severally liable.

In Sellers' fourth issue they allege the trial court erred in issuing a joint and several judgment as to all defendants when there were no findings to support claims against Ms. Zohreh Shaarpour individually. Sellers argue first that there are no "findings" to support claims against Ms. Shaarpour. To the contrary, Ms. Shaarpour was a defendant and there are multiple findings that Omnova relied on the defendants' misrepresentations and that the defendants breached the contract. Sellers also argue that "No evidence has been cited which would support a judgment against Ms. Shaarour [sic] for either fraud or breach of contract." As with Sellers' other issues we construe this issue as one challenging the legal sufficiency of the evidence to support joint and several liability.

Defendants are jointly and severally liable for breaches of contracts to which

19

they are a party. *InvestIN.com Corp. v. Europa Intern., Ltd.*, 293 S.W.3d 819, 828–29 (Tex. App.—Dallas 2009, pet. denied). Joint and several liability is appropriate in contract cases when two or more persons promise the same performance. *Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 99 (Tex. App.—Eastland 2006, pet. denied). When an obligation is joint and several, any one of the obligors may be held liable. *InvestIN.com Corp.*, 293 S.W.3d at 829.

The parties to the APA included Z.M. Shayjayadam3, LLC, Lonestar Blending, Inc., NFS, Zohreh Shaarpour, and Manocher Shaarpour. The trial court found that, "At the time of Closing, Mrs. Zoreh Shaarpour was the President of Lonestar Blending and NFS and she was the Manager of Z.M. ShayJayAdam3. She signed the Closing documents in her capacity as President or Manager of those entities and in her individual capacity." The trial court further found that Shaarpour, who also signed in his individual capacity, acted at all relevant times both individually and as the agent of all three Seller entities. Sellers have not challenged those findings of fact.

The APA defined "Sellers' Knowledge" as "the knowledge that Manocher Shaarpour and/or Zohreh Shaarpour possess or the knowledge that such person would obtain upon reasonable inquiry and investigation." The APA states that "Sellers, jointly and severally, represent and warrant to Buyer" that each of the each of the representations and warranties of the Sellers in the APA "are true, accurate, correct and complete as of the Closing Date." Each of the parties to the APA made the same promises, i.e., their financial condition had not changed since the financial statement date, certain firms were in their list of "Top 20" customers, and they had no disputes with current customers. As a party to the APA Ms. Shaarpour made these promises and is responsible as a party for the misrepresentations made on her behalf by Shaarpour.

There was also evidence from LeMay that "the entities and Mr. and Mrs. Shaarpour breach[ed] their representation of warranty that there had been no change in the financial condition of the sellers since December of 2014." LeMay further testified that in his recollection the business accounts were in the name of Mrs. Shaarpour. The trial court's finding of joint and several liability is supported by the APA itself and evidence that Ms. Shaarpour entered into the APA as an individual, signing the contract in her individual capacity, and in her capacity as president and manager of the entities. Reviewing the evidence under the appropriate standard of review, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not we conclude there was evidence to support the trial court's finding of joint and several liability. We overrule Sellers' fourth issue.

## VI. The trial court's finding on the Holdback Amount is supported by the court's finding of prior material breach.

In their fifth issue Sellers allege the trial court erred in denying their counterclaims. Sellers note they filed a counterclaim seeking unpaid sums allegedly owed under the "holdback" language of the APA.[4] The "holdback" provision provided:

> Buyer will pay the amount of $1,500,000 (the "**Holdback Amount**") to an account designated by the Sellers in writing no later than the second Business Day following the second anniversary of the Closing Date.

With regard to this provision, the trial court found that "Defendants' prior material breaches of the APA bar [their] recovery of the Holdback" Amount. The trial court further found that if Omnova were found to be liable for the Holdback

---

[4] Although Sellers filed other counterclaims the Holdback Amount finding is the only finding they challenge on appeal.

Amount, its contract damages would increase by $1.5 million, which it would have been obligated to pay Sellers under the contract. In other words, even if Sellers' prior material breach did not bar recovery of the Holdback Amount, the trial court's damages calculation had the effect of barring recovery. In their fifth issue Sellers argue that the trial court's finding of prior material breach was not supported by the evidence, which vitiates the trial court's finding on the Holdback Amount.

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration*, *Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). By contrast, when a party commits a nonmaterial breach, the other party "is not excused from future performance but may sue for the damages caused by the breach." *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.–Houston [1st Dist.] 2014, pet. denied).

What constitutes a breach of contract is a question of law, but whether the breaching conduct occurred is a question of fact. *See Bartush-Schnitzius Foods*, 518 S.W.3d at 436. Like other issues of fact, materiality may be decided as a matter of law only if a reasonable factfinder could reach only one decision. *See City of Keller*, 168 S.W.3d at 822.

In reviewing whether the evidence supports the trial court's finding of material breach we begin with the terms of the APA. Article V, which contains the representations and warranties of Sellers, contains a provision stating:

> Each of the representations and warranties is deemed material and the Buyer, in executing, delivering and consummating the transactions contemplated by this Agreement, has relied upon the truth, accuracy, correctness and completeness of each of such representations and

22

warranties and the applicable Schedules.

To determine whether a breach is material, Texas courts consider the five factors articulated in *Mustang Pipeline*:

(a) the extent to which the injured party will be deprived of the benefit he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Mustang Pipeline*, 134 S.W.3d at 199.

Upon reviewing the record and the *Mustang* factors, we conclude there was legally sufficient evidence to support the trial court's finding of prior material breach. The first factor on materiality—whether Omnova would be deprived of the benefit it reasonably expected—weighs in favor of the trial court's finding of prior material breach. Sellers' breaches of the APA deprived Omnova of having an accurate account of Sellers' finances, which was an important part of the bargain. The fourth and fifth factors also weigh in favor of the trial court's finding of prior material breach.

No action on Sellers' behalf could be reasonably construed as a potential cure for the false representations made in the APA and those made by Shaarpour in the NFS Sales Summary. *See, e.g. Duncan v. Woodlawn Mfg., Ltd.*, 479 S.W.3d 886, 902 (Tex. App.—El Paso 2015, no pet.) (holding that actions of a CEO, which touch on fiduciary and trust obligations would undoubtedly be material). With regard to

the standards of good faith and fair dealing, the trial court found that Shaarpour knew that representations he made in May and throughout the due diligence period were false or had subsequently become false. The trial court further found that Shaarpour knew he had not disclosed information that was critical to Omnova's decision whether to close on the APA. The record, as described above, supports the trial court's findings.

Because we have concluded the evidence is legally sufficient to support the trial court's finding of prior material breach by Sellers, the evidence also supports the trial court's finding on the Holdback Amount. *See Mustang Pipeline*, 134 S.W.3d at 196 ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). We overrule Sellers' fifth issue.

## CONCLUSION

Having overruled each of Sellers' issues, we affirm the trial court's judgment.

/s/    Jerry Zimmerer
Justice

Panel consists of Justices Christopher, Jewell, and Zimmerer.